IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RANDY WILLIAMS,

                          Plaintiff,        Civil Action No.
                                            9:13-CV-0582 (GTS/DEP)

      v.

DAVID ROCK, Superintendent,
Upstate Correctional Facility; *et al.*,

                          Defendants.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

Randy Williams, *Pro Se*
98-A-4232
Bare Hill Correctional Facility
P.O. Box 20
Malone, NY 12953

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN          RICHARD LOMBARDO, ESQ.
New York State Attorney General    Assistant Attorney General
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Randy Williams, a New York State prison inmate, has commenced this action against several unidentified corrections employees sued as "Doe" defendants, pursuant to 42 U.S.C § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, alleging infringement of his constitutional and statutory right to practice his chosen religion.  Plaintiff, who is a Muslim, alleges that defendants deprived him of his right to exercise his religion through their failure, on five occasions, to deliver religious meals in accordance with the dictates of his faith.

Currently pending before the court is a motion by defendant David Rock, the only defendant thus far to have appeared in the action, seeking dismissal of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]  For the reasons set forth below, I recommend that defendant's motion be granted.

---

[1]     As will be discussed more below, because plaintiff's complaint named only Doe defendants, I issued an initial order, dated August 7, 2013, directing that defendant Rock, the superintendent of the correctional facility at which the violations allegedly occurred, be added as a defendant solely for purposes of service and to facilitate plaintiff's efforts to identify the Doe defendants through pretrial discovery. Dkt. No. 11 at 3.

I.      BACKGROUND[2]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1.  Although he is now confined elsewhere, at the times relevant to his claims in this action, plaintiff was incarcerated at the Upstate State Correctional Facility ("Upstate"), located in Malone, New York.[3] *Id.* at 5.

In August 2012, plaintiff, a practicing Muslim, invoked his right to participate in the Muslim holiday of Ramadan.  Dkt. No 1 at 5.  During Ramadan, certain activities are forbidden during the hours between sunrise and sunset, including eating, drinking, and sexual intercourse.  *Id.* at 5.  Inmates at Upstate participating in Ramadan are provided one meal to be consumed at sunset and a second meal, known as Sahoor, prior to sunrise.  *Id.*

---

[2]     In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

[3]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons.  *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

Plaintiff alleges that on several occasions during Ramadan in 2012, corrections officers responsible for delivering meals to inmates served his meals at times that interfered with his Ramadan observance. On August 6, 2012, defendants delivered his sunset meal twenty minutes prior to sunset, causing the food to become "cold and unpalatable" before he could consume it at a time consistent with his religious beliefs. Dkt. No. 1 at 5. Again on August 7, 2012, defendants delivered the sunset meal prematurely, causing his ice cream to melt by the time sunset had arrived. *Id.* Plaintiff further alleges that, on both August 6 and 7, 2012, his food tray was collected too early to allow him sufficient time to eat his meal in accordance with the tenets his faith. *Id.*

Despite having filed a grievance concerning the matter on August 8, 2012, plaintiff again received his sunset Ramadan meals approximately forty minutes early on August 13, 14, and 15, 2012. Dkt. No. 1 at 6. Plaintiff also alleges that his food trays were collected between ten and fifteen minutes prior to sunset on those three occasions, requiring him to choose between not eating "the hot meal to preserve the integrity and completion of his fast or to eat and annul the fasting prematurely canceling its validity." *Id.* On August 13, 2012, plaintiff chose not to eat the sunset meal to preserve his fast, and instead subsisted only on the Sahoor meal

4

consumed prior to sunrise.  *Id.*  On August 14 and 15, plaintiff broke his fast by eating the sunset meal that arrived too early to avoid hunger and potential health complications.  *Id.* at 6.

As a result of one or more grievances complaining of defendants' early delivery of his sunset meals during Ramadan, plaintiff was advised that "'corrective action was taken'" and the DOCCS Central Office Review Committee determined "'that after investigation [plaintiff's food] trays were delivered and retrieved too early on the 13, 14, and 15 of August 2012.'" Dkt. No. 1 at 6.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action by filing a complaint and accompanying application to proceed in the action *in forma pauperis* ("IFP") on May 20, 2013.  Dkt. Nos. 1, 2.  Plaintiff asserts claims under 42 U.S.C. § 1983 and the RLUIPA, arising from allegations that the early delivery of his Ramadan sunset meals violated his right to free exercise of religion.  *See generally* Dkt. No. 1.  As relief, plaintiff seeks damages in the amount of $50,000 for each day that his rights were violated.  *Id.* at 8.

On August 7, 2013, the court granted plaintiff's IFP request and ordered the addition of the superintendent of Upstate, David Rock, as a defendant for purposes of service and discovery only.  Dkt. No. 11.

5

Following service, defendant Rock filed a motion seeking dismissal of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 23. In his motion, defendant Rock contends that (1) plaintiff's RLUIPA claim should be dismissed because the RLUIPA does not authorize an award of monetary damages against individual defendants; (2) the complaint fails to state a claim under the First Amendment; and (3) the Doe defendants are entitled to qualified immunity. *See generally* Dkt. No. 23-1. Plaintiff has since responded to defendant Rock's motion, conceding the first point regarding the RLUIPA cause of action, but otherwise opposing the motion. *See generally* Dkt. No. 29.

Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and the Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Legal Standard Governing Motion to Dismiss

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-

defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. at 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See Id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))(internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d

100, 104 (N.D.N.Y. 2011) (Hurd, J.)("A pro se complaint must be read liberally.").

### B. Plaintiff's RLUIPA Claim

In his complaint, plaintiff asserts a claim against the Doe defendants arising under the RLUIPA. Dkt. No. 1 at 7. Defendant Rock now seeks dismissal of that cause of action because plaintiff's complaint seeks only money damages against state officials. Dkt. No. 23-1 at 5.

It is now well-established that money damages are not available against state actors in their official capacities for a violation of the RLUIPA. *See Sossamon v. Tex.*, 131 S. Ct. 1651, 1663 (2011) ("We conclude that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver."). In addition, the Second Circuit has held that the "RLUIPA does not provide a cause of action against state officials in their individual capacities." *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013).

Plaintiff's complaint in this case does not specify whether he is suing the Doe defendants in their official or individual capacities, or both. Because he seeks only money damages, however, and in either case his damage claim is precluded, I recommend that plaintiff's RLUIPA claim be

9

dismissed.[4]

C.    Plaintiff's First Amendment Claim

Plaintiff alleges that, through their conduct, the Doe defendants unlawfully interfered with the exercise of his religious beliefs in violation of his rights as guaranteed under the First Amendment.  Dkt. No. 1 at 7.  As was discussed above, plaintiff's claims stem from five instances in August 2012 when, because of the timing associated with delivery of his evening meal, he was allegedly forced to choose between eating his meals cold (or not at all), or violating the rules governing Ramadan.  *Id.* at 5-6.

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including the right to be served religiously sanctioned meals. *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975).  Undeniably, the reach of the First Amendment's free exercise clause extends to that of an inmate's diet and participation in religious meals.  *McEachin v. McGuinnis,*

---

[4]    In his response to defendants' motion to dismiss, plaintiff concedes his RLUIPA must fail.  *See* Dkt. No. 29 at 2 ("The Plaintiff hereby concedes to the facts as stated by the defendant's [sic] in Point 1 and accepts them as true.").

357 F.3d 197, 204-05 (2d Cir. 2004); *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003).

Ordinarily, the Eighth Amendment establishes, as a constitutional minimum, the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford*, 352 F.3d at 597; *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other. *Benjamin v. Couglin,* 905 F. 2d 571, 574 (2d Cir. 1990).

As a threshold matter, to establish a First Amendment violation, "[t]he prisoner must show . . . that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006). In evaluating this factor, the court must be wary of "question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989) (alteration omitted)).

The court must then inquire into whether a defendant's conduct, which allegedly deprives plaintiff of his free exercise rights, is reasonably related to the penological interest identified. *Ford*, 352 F.3d at 594; *see*

*also Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) ("Even if Defendants-Appellees substantially burdened [plaintiff -Appellant]'s sincerely held religious beliefs, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)).  To evaluate whether a challenged regulation or decision by prison officials is reasonable,[5] courts must evaluate the following four factors:

> [(1)] [W]hether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [(2)] whether prisoners have alternative means of exercising the burdened right; [(3)] the impact on the guards, inmates, and prison resources of accommodating the right; and [(4)] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin*, 467 F.3d at 274 (footnote omitted).

Here, in accordance with the above-described burden-shifting standard, to survive a motion to dismiss, plaintiff's complaint must allege sufficient facts plausibly suggesting that the Doe defendants' alleged conduct in this case constituted a substantial burden on plaintiff's sincerely

---

[5]     The Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a prison regulation denying such exercise."  *Salahuddin*, 467 F.3d at 274 n.4.

held religious beliefs.[6]  Courts have consistently held that isolated incidents "involving a denial of religiously mandated food do[es] not give rise to a First Amendment claim."  *Washington v. Afify,* 968 F. Supp. 2d 532, 538 (W.D.N.Y. 2013).  Because plaintiff has alleged that he was provided his sunset meal up to forty minutes early on, at most, five of the thirty days of Ramadan during August 2012, Dkt. No. 1 at 5-6, I find that his complaint fails to allege sufficient facts plausibly suggesting that the Doe defendants substantially burdened his religious beliefs.  Instead, the allegations suggest, at best, a *de minimis* constitutional violation, which is insufficient to support a First Amendment free exercise claim.  *See Norwood v. Strada,* 249 F. App'x 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious meals did not substantially burden the plaintiff's free exercise rights); *Evans v. Jabe,* No. 11-CV-0104, 2014 WL 202023, at *8 (W.D. Va. Jan. 17, 2014) ("[The plaintiff] fails to establish that his receipt of six incomplete or tardy breakfast trays after daylight fasting began placed a substantial burden on his celebration of Ramadan or participation in the thirty-day fast."); *Wilson v. Woodbourne Corr. Facility*, No. 11-CV-1088, 2012 WL 1377615, at *2 (N.Y.N.D. Mar. 21, 2012) (Baxter, M.J.), *report and recommendation adopted by*  2012

---

[6]     Defendant Rock has not questioned the sincerity of plaintiff's religious beliefs.

WL 1366590 (N.D.N.Y. Apr. 19, 2012) (Hurd, J.), (finding that an allegation that the defendant delayed the delivery of one of the plaintiff's Ramadan meals was "at most, a *de minimis* burden on his religious expression"); *Evans v. Albany Cnty. Corr. Facility,* No. 05-CV-1400, 2009 WL 1401645, at *8 (N.Y.N.D. May 14, 2009) (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally *de minimis*); *Odom v. Dixion,* No. 04-CV-0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation).[7] Accordingly, I recommend that defendants' motion be granted, and that the plaintiff's First Amendment free exercise claim be dismissed.

D.    Whether to Permit Amendment

The last issue to be addressed is whether the plaintiff should be afforded an opportunity to amend his complaint to cure the deficiencies identified above.  Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a

---

[7]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this instance, although I am skeptical that plaintiff may allege any further facts in an amended complaint that could give rise to a plausible

First Amendment claim, I acknowledge the possibility that, with the inclusion of more details, he may be able to cure the deficiencies identified above. Accordingly, I recommend plaintiff be granted leave to amend his complaint with respect to his First Amendment claim.[8]

In the event plaintiff chooses to file an amended complaint, he is advised that the law in this circuit provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *see also Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in his amended complaint, plaintiff must clearly set forth the substantive facts that may give rise to the First Amendment claim.

---

[8]     Although non-monetary relief may be available under the RLUIPA, that claim (as well as his First Amendment claim to the extent plaintiff may seek declaratory or injunctive relief) is moot due to plaintiff's transfer from Upstate to a different prison facility and the absence of any allegation that his religious rights continue to be violated. *See Murphy v. Hunt*, 455 U.S. 478, 481 (1982) ("[A] case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (quotation marks omitted)); *Wiliams v. Roberts*, No. 11-CV-0029, 2011 WL 7468636, at *6 (N.D.N.Y. Dec. 15, 2011) (Treece, M.J.), *report and recommendation adopted by* 2012 760777 (N.D.N.Y. Mar. 7, 2012) (Suddaby, J.), (finding the plaintiff's RLUIPA claim moot where (1) he was released from prison prior to adjudication of the claim on the merits, and (2) there were no allegations plausibly suggesting a risk of repetitive conduct).

Finally, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)).

IV.    SUMMARY AND RECOMMENDATION

After a careful review of the record in this case, I find that plaintiff's RLUIPA claim is subject to dismissal because he seeks money damages not available under that provision. I further find that plaintiff's complaint fails to allege facts plausibly suggesting that the Doe defendants violated his free exercise rights under the First Amendment.[9]

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 23), be GRANTED with leave to replead only with respect to his First Amendment claim.

---

[9]    In light of my recommendation concerning the merits of plaintiff's claims, I have declined to address defendant Rock's alternative argument regarding qualified immunity.

18

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 2, 2014
             Syracuse, New York

David E. Peebles
U.S. Magistrate Judge


**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Richmond Division.
Andre' D. EVANS, Plaintiff,
v.
John JABE, et al., Defendants.

Civil Action No. 3:11CV104.
Jan. 17, 2014.

Andre' D. Evans, Waverly, VA, pro se.

Lara Kate Jacobs Todd, Office of the Attorney
General, Richmond, VA, for Defendants.

**MEMORANDUM OPINION**

JOHN A. GIBNEY JR., District Judge.

**\*1** Andre' D. Evans, a Virginia inmate proceeding *pro se* and *in forma pauperis,* filed this civil action under 42 U.S.C. § 1983.FN1 The action proceeds on his Particularized Complaint (ECF No. 23 ("Complaint")). By Memorandum Opinion and Order entered March 19, 2013, the Court granted summary judgment for Defendants on Claims One (b) and Three and ordered further briefing on Claims One (a), Two, and Four. *Evans v. Jabe,* No. 3:11CV104, 2013 WL 1155532, at *2, *5 (E.D.Va. Mar. 19, 2013). The matter is now before the Court on Defendants'FN2 Supplemental Motion for Summary Judgment ("Supp'l Mot. Summ. J.," ECF No. 53) and the Second Supplemental Memorandum in Support ("Second Supp'l Mem. Supp .," ECF No. 61). Evans was provided with appropriate *Roseboro*FN3 notice. (ECF No. 55, 64.) Evans has not responded. This matter is ripe for judgment. For the reasons stated below, Defendants' Supplemental Motion for Summary Judgment will be GRANTED.

FN1. That statute provides, in pertinent part:

Every person who, under color of any

statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

42 U.S.C. § 1983.

FN2. The remaining seven defendants ("Defendants") moved for summary judgment: (1) John Jabe, Deputy Director Operations, Virginia Department of Corrections ("VDOC"); (2) David Robinson, Eastern Regional Director, VDOC; (3) D.B. Everett, Warden of Sussex II State Prison ("Sussex II"); (4) M. Vargo, Assistant Warden of Sussex II; (5) J. Halsey–Harris, Building 2 Unit Manager, Sussex II; (6) Sergeant Mouring, A—Break Night Building Supervisor, Sussex II; and, (7) Sergeant J. Shanks, B—Break Night Building Supervisor.

FN3. *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975).

## I. MOTION FOR EXTENSION OF TIME

Evans seeks an indefinite extension of time in which to file his response in opposition to Respondents' Supplemental Motion for Summary Judgment and Second Supplemental Memorandum in Support. ("Third Motion for Extension of Time," ECF No. 67.) The Court has previously granted Evans two extensions of time. (ECF No. 64, 66.) In his Second Motion for Extension of Time, Evans indicated that he suffers from epilepsy which limits his current ability to litigate his claims and sought an indefinite extension of time in which to file his response. (ECF No. 65, at 1–3.) In granting that motion, the Court explained that to the extent Evans felt that he was unable to litigate his claims, he

could move to voluntarily dismiss the action without prejudice. (ECF No. 66, at 1.) The Court provided Evans until December, 5, 2013 to file a response. (*Id.*). On December 4, 2013, Evans filed his Third Motion for Extension of Time, but has yet to respond to the Supplemental Motion for Summary Judgment. (ECF No. 67.)

Under Federal Rule of Civil Procedure 6(b)(1)(A) FN4 the Court may grant an extension of time for good cause shown. Fed.R.Civ.P. 6(b)(1)(A). However, in the Eastern District of Virginia "[a]ny requests for an extension of time relating to motions ... in general, will be looked upon with disfavor." E.D. Va. Loc. Civ. R. 7(I). In his Third Motion for Extension of Time, Evans again claims that he is "unable to get access to the law library due to his being in the prison hospital" and is "unable to gather necessary rebuttal affidavits, or any other legal or factual material that supports his claims." (ECF No. 67, at 1–2 (capitalization and spelling corrected).) Evans admits that he has an "unknown time of release back to general population." (*Id.* at 2.) Evans fails to provide sufficient factual support or good cause to justify an indefinite extension under Federal Rule of Civil Procedure 6(b)(1)(A). Nothing submitted by Evans when he may actually be able to litigate his claims. Evans filed his action in February 2011, and the Court will not permit the action to languish on its docket until some indefinite future date. *Cf. McCoy v. Abassi,* No. 3:10CV875, 2012 WL 4933301, at *2 (E.D.Va. Oct. 16, 2012) (" 'The court cannot countenance the bringing of an action ... to languish on its docket until some indefinite future date when the plaintiff may actually be able to serve those defendants.' " (quoting *Villeneuve v. Connecticut,* No. 09–P–S, 2009 WL 1783540, at *2 (D. Me. June 22, 2009))).

> FN4. "When an act may or must be done within a specified time, the court may, for good cause, extend the time: (A) with ... motion ... if a request is made, before the original time or its extension expires .... "

Fed.R.Civ.P. 6(b)(1)(A).

**\*2** While Evans brings his motion under Fed.R.Civ.P. 6(b), he also seeks additional time to obtain discovery in the form of affidavits and factual material to support his opposition. Under Federal Rule of Civil Procedure 56(d), a party opposing summary judgment may request a continuance when the party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition ...." Fed.R.Civ.P. 56(d). To obtain an extension, the party must make more than a conclusory allegation that additional discovery is needed. *See Hamilton v. Geithner,* No. 1:08CV1112 (JCC), 2009 WL 1683298, at *6 (E.D. Va. June 15, 2009).FN5 Instead, a Rule 56(d) affidavit "must specifically identify what evidence discovery will turn up and how that evidence will allow the party to oppose summary judgment." *Id.* (citations omitted).

> FN5. While *Hamilton* cites former Federal Rule of Civil Procedure 56(f), Federal Rule of Civil Procedure 56(d) "carries forward without substantial change the provisions of former subdivision (f)." Fed.R.Civ.P. 56(d), Advisory Committee Notes, Amend.2010.

Here, Evans failed to show by affidavit or declaration and failed to identify with specificity in any other manner what evidence additional discovery would turn up to support his opposition to summary judgment. *See, e.g., Morrow v. Farrell,* 50 F. App'x 179, 180 (4th Cir.2002) (finding no abuse of discretion by district court when it denied a continuance because plaintiff "failed to identify any specific facts that he was yet to discover"); *Nguyen v. CNA Corp.,* 44 F.3d 234, 242 (4th Cir.1995). Evans generally states he needs time to "gather necessary rebuttal affidavits" or "factual material that supports his claim." (ECF No. 67, at 2 (capitalization corrected).) Evans "fail[s] to identify any facts essential to his opposition that [are] not already available to him." *Boyd v. Guiterrez,* 214 F. App'x 322, 323 (4th Cir.2007). The facts essential

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

to Evans's opposition largely lay within his control and Evans could produce such information from the infirmary. Moreover, as discussed below, the Court dismisses the majority of Evans's claims because he cannot show that Defendants substantially burdened his religion. Evans's generalized request for a continuance fails to adequately support his motion. Accordingly, Evans's Third Motion for Extension of Time will be DENIED. (ECF No. 67.) [FN6]

> [FN6]. The Court's decision here does not preclude Evans from bringing future claims if Defendants substantially interfere with Evans's Ramadan fasting requirements.

## II. SUMMARY OF CLAIMS

Evans's claims stem from a period of lockdown occurring at Sussex II between the dates of August 31, 2010 and September 9, 2010. During that period, Evans alleges that "defendants failed to provide him with hot meals, sufficient calories, and meals served within the religiously required time period during the Muslim holy month of Ramadan. (month of fasting)." (Compl.1.) Evans's remaining claims are best summarized as follows: [FN7]

> [FN7]. Despite the Court's admonitions in the Memorandum Order entered on September 27, 2011 (ECF No. 19), Evans failed to provide a particularly coherent summary of his claims. Accordingly, the Court has done its best to parse his allegations in a logical fashion.

Claim One: Defendants violated Evans's First Amendment [FN8] right to free exercise of his religion by:

> [FN8]. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I.

(a) failing to provide him with adequate meals served during the religiously required time period due to an institutional lockdown.

Claim Two: Defendants violated Evans's Eighth Amendment [FN9] rights by failing to provide hot meals and sufficient calories during Ramadan due to an institutional lockdown.

> [FN9]. "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

**\*3** Claim Four: Defendants placed a substantial burden on Evans's exercise of his religion in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") [FN10] by interfering with Ramadan fasting requirements due to an institutional lockdown.

> [FN10]. 42 U.S.C. § 2000cc–1(a).

## III. SUMMARY JUDGMENT
### A. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Id. at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or " 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Id. (quoting former Fed.R.Civ.P. 56(c) and 56(e) (1986)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

In support of their Supplemental Motion for Summary Judgment, Defendants submit: (1) the affidavit of M. Vargo, the Warden at Sussex II (Mem. Supp. Mot. Summ. J. Ex. I ("Vargo Aff."), ECF No. 40–3); (2) a sun calendar for Waverly, Virginia in September 2010 (First Supp'l Mem. Supp. (ECF No. 54–1) ("Sun Calendar"); (3) the affidavit of L. Shear, Registered Dietician and Head Dietician for the VDOC (*id.* (ECF No. 54–3) ("Shear Aff.")); (4) the affidavit of M. Mouring, Sergeant at Sussex II ( *id.* (ECF No. 54–4) ("Mouring Aff.")); (5) two Control Logs from Sussex II during the relevant period (*id.* (ECF Nos. 54–5 and 54–6)); (6) the supplemental affidavit of M. Vargo (Second Supp'l Mem. Supp. (ECF No. 61–1) ("Vargo Supp'l Aff.")); and, (7) the affidavit of J. Shanks, former Sergeant at Sussex II (*id.* (ECF No. 61–2) ("Shanks Aff.")).

As Evans failed to respond, Evans fails to cite to the Court any evidence, such as his Complaint, that he wishes the Court to consider in opposition to the Motion for Summary Judgment. *See* Fed.R.Civ.P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment). Evans's complete failure to present any evidence to counter Defendants' Supplemental Motion for Summary Judgment permits the Court to rely solely on Defendants' submissions in deciding the Motion for Summary Judgment. *See Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994) (" 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.' " (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 & n. 7 (5th Cir.1992))). Moreover, even if the Court considers the admissible evidence in Evans's Complaint, Defendants remain entitled to summary judgment.

**\*4** Accordingly, the following facts are established for the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Evans.

## IV. UNDISPUTED FACTS

Sussex II began observing Ramadan on the evening of August 10, 2010 as directed by a memorandum from John Jabe, the Deputy Director of Operations. (Vargo Aff. ¶¶ 5, 7, Encl. A, at 1; Compl. 3.) The observance continued for thirty calendar days, until the evening of September 9, 2010. (Vargo Aff. ¶ 5; Encl. A, at 1.) The memorandum from Jabe and the Food Service Manual set forth that offenders must be fed a breakfast meal before sunrise and a dinner meal after sunset, and the offenders must have at least twenty minutes to consume the meal. (Vargo Aff. ¶¶ 56; Encl. A, at 2; Shear Aff. ¶ 4.) A third meal, or bag meal, was to be distributed to offenders during the evening hours, and offenders were authorized to take the bag meal back to their living areas to be finished within four hours. (Vargo Aff. ¶ 6; Encl. A, at 2; Shear Aff. ¶ 4.) Those offenders observing Ramadan receive the same number of daily calories (2700 to 2800) as those offenders not participating in Ramadan. (Shear Aff. ¶ 5.) Offenders have access to the meal menu for Ramadan and thus, would have known what meals would be provided. (Shanks Aff. ¶ 9.)

On August 31, 2010, due to security concerns, Sussex II was placed on full lockdown status and the prison officials used the lockdown to conduct the quarterly shakedown. (Vargo Aff. ¶ 7.) Sussex II makes every effort to not conduct quarterly shakedowns during Ramadan, but security concerns during 2010 necessitated the shakedown at that time. (*Id.*) Normal operations resumed on September 9, 2010, when Sussex II came off of lockdown status. (*Id.*)

During the ten days that Sussex II was on lockdown during Ramadan, "the procedure for feeding breakfast to the offenders participating in Ramadan was no different from when the facility was not on lockdown." (Vargo Supp'l Aff. ¶ 4.) During the ten days of lockdown, Defendants Sergeant Mouring and Sergeant Shanks worked the 6 p.m. to 6 a.m. night shift. (Shanks Aff. ¶ 5; Mouring Aff. ¶ 5 .)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sussex II served Ramadan dinner meals to offenders after sundown. (Shanks Aff. ¶ 5; Mouring Aff. ¶ 5.) For the breakfast meal, both prior to and during the lockdown, Sussex II served breakfast to the offenders observing Ramadan in their cells, allowing them twenty minutes before sunrise to consume their meals. (Shanks Aff. ¶¶ 6–7; Vargo Supp'l Aff. ¶ 7.)

The institution kitchen prepared the Ramadan food trays and the sergeants had no involvement in their preparation. (Mouring Aff. ¶ 8.) The building sergeant retrieved the Ramadan meal tray food cart from the kitchen and counted the trays before leaving to ensure the cart contained the correct number of Ramadan trays. (Shanks Aff. ¶ 8.) When the sergeant arrived in the housing unit with the food cart, he pulled a designated Ramadan inmate from his cell to count the meal trays a second time. (*Id.*) Once the inmate verified the number of trays, the inmate and sergeant distributed the trays. (*Id.* ¶ 9.) Each participating inmate's cell door bore a mark indicating whether the offender received the Nation of Islam tray or Sunni tray and the inmate was given the appropriate meal tray. (*Id.*) Each inmate bore responsibility "to remove the lid from his tray and make sure that there [was] no missing food or beverage items since the security staff is not responsible for the content of the tray." (*Id.*) If the inmate noticed a missing item and reported it to the sergeant, the sergeant would notify the kitchen and a replacement food item would be delivered to the offender. (*Id.*)

**\*5** On August 31, 2010, Evans received a breakfast food tray missing food items. (Compl.1.) On September 2, 2010, Evans "was forced to not eat" because he received spoiled milk to eat with his breakfast cereal and unnamed defendants refused to replace it. (Compl.1–2.) On September 3 and 4, 2010, Evans received his food tray "past time constraints set forth by religious edicts," forcing Evans to abstain from eating or drinking until the evening meal after sunset. (Compl.2.) On September 6, 2010, Evans received a breakfast tray

"missing the main course" and by the time Evans received the replacement tray "it was well after sunrise and the fasting period for the day had started." (*Id.*) Finally, on September 8, 2010, Evans received his breakfast tray "after farji (morning prayer) salat had already been performed, thereby not permitting him the chance to eat breakfast without breaking his fast." (*Id.*) [FN11]

> [FN11]. Defendants counter that Evans timely received his food each morning day and lodged no complaints to Officer Mouring or Shanks. Defendants explain that Evans was housed in Housing Unit 2(HU2), A pod, during Ramadan in 2010. (Mouring Aff. ¶ 6.) The Control Log for HU2 A pod reflects that food trays were delivered to inmates beginning at 4:23 a.m. on August 31, 2010. (*Id.*) On September 2, 3, and 4, 2010 delivery was completed in the A pod by 4:53 a.m., 4:41 a.m., and 4:36 a.m., respectively. (*Id.*) On September 6 and 8, 2010, delivery was completed in the A pod by 4:27 a.m. and 4:37 a.m., respectively. (*Id.*) During the period of September 1, 2010 through September 9, 2010, sunrise occurred between 6:39 a.m. and 6:45 a.m., hours after the offenders received their Ramadan meal trays. (Sunrise Calendar at 1.) Sergeant Shanks avers that she has no recollection that offender Evans complained to her during Ramadan 2010 that his tray had missing food items. (Shanks Aff. ¶ 11.) Sergeant Mouring avers, "I know Evans," but swears that he has no recollection of Evans complaining of missing food items. (Mouring Aff. ¶ 8.) Sergeant Mouring explains that if Evans had informed him of a missing item or that he needed a replacement tray,
>
> > [he] would have looked at the items on the tray. If there had been a missing food item or he needed a food item replaced, [he] would have contacted the kitchen

for the item and would have either sent an officer to the kitchen to get the food item or [he] would have gone to pick it up [himself] so long as it was feasible based on institutional needs.

(*Id.*)

Sussex II had no lockdown during the 2011, 2012, or 2013 Ramadan observances. (Vargo Supp'l Aff. ¶ 9.) Evans also filed no grievances regarding Ramadan food service in 2011, 2012, or 2013. (*Id.*)

### V. EIGHTH AMENDMENT

In order to survive summary judgment for a claim under 42 U.S.C. § 1983, a plaintiff "must ... 'affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights.' " *Wright v. Collins,* 766 F.2d 841, 850 (4th Cir.1985) (quoting *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir.1977)). Furthermore, " '[t]he doctrine of *respondeat superior* has no application under [§ 1983].' " *Id.* (quoting *Vinnedge,* 550 F.2d at 928). Evans must demonstrate that each defendant had "personal knowledge of and involvement in the alleged [constitutional] deprivation" to establish liability under § 1983. *Id.*

To survive a motion for summary judgment on an Eighth Amendment "cruel and unusual punishment" claim, Evans "must prove two elements: (1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.' " *Johnson v. Quinones,* 145 F.3d 164, 167 (4th Cir.1998) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). To satisfy the objective element of an Eighth Amendment claim, the deprivation complained of must be extreme and amount to more than the " 'routine discomfort [that] is part of the penalty that criminal offenders pay for their offenses against society.' " *Strickler v. Waters,* 989 F.2d 1375, 1380 n. 3 (4th Cir.1993) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) ) (some internal quotation marks omitted). Thus, Evans " 'must produce evidence of a serious or sig-

nificant physical or emotional injury resulting from the challenged conditions.' " *Rish v. Johnson,* 131 F.3d 1092, 1096 (4th Cir.1997) (quoting *Strickler,* 989 F.2d at 1381).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir.1999) (citing *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976)).

**\*6** [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. *Farmer* teaches that "general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones,* 145 F.3d at 168 (citing *Farmer,* 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.' " *Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir.2004) (quoting *Rich v. Bruce,* 129 F.3d 336, 340 n. 2 (4th Cir.1997).

Evans avers that Defendants violated his Eighth Amendment rights by failing to provide sufficient food during Ramadan due to an institutional lockdown.FN12

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN12. As stated on page nine, *supra*, Evans bases his Eighth Amendment claim on the following six instances: on August 31, 2010, he received a breakfast tray with "missing food items;" on September 2, 2010, he received a breakfast tray with spoiled milk "and was forced to not eat;" on September 3 and 4, 2010, he received his breakfast beyond the "time constraints set forth by religious edicts" and "was forced to abstain [ ] from any food or drink [until] the evening meal after sunset;" on September 6, 2010 "was missing the main course off his breakfast tray" and received the replacement tray well after sunrise and the fasting period had already started; and on September 8, 2010, he received his breakfast tray "after his farji (morning prayer) salat had already been performed, thereby not permitting him the chance to eat breakfast without breaking his fast." (Compl.1–2.)

Defendants explain that inmates who practice Ramadan receive three meals outside of the time for fasting. (Vargo Aff. ¶¶ 5–6; Encl. A, at 2; Shear Aff. ¶ 4.) These meals include: (1) dinner after sundown; (2) a bag meal distributed in the evening hours that inmates can take back to their living areas and consume during the next four hours; and, (3) breakfast before sunrise. (Vargo Aff. ¶¶ 5–6; Encl. A, at 2; Shear Aff. ¶ 4.) Evans alleges that on these six instances he received inadequate breakfast, but he does not argue that Defendants failed to provide him with sufficient dinner meal trays or bag meals on those six days. Evans also makes no allegation that Defendants failed to provide sufficient meals on the additional eighty-four instances during the 2010 Ramadan fast.

Evans fails to satisfy either the objective or subjective component of his Eighth Amendment claim.FN13 "The Eighth Amendment requires that inmates be provided 'well-balanced meal[s], containing sufficient nutritional value to preserve

health.' " *Berry v. Brady,* 192 F.3d 504, 507 (5th Cir.1999) (alteration in original) (some internal quotation marks omitted) (quoting *Green v. Ferrell,* 801 F.2d 765, 770 (5th Cir.1986)); *see also Wilson v. Johnson,* 385 F. App'x 319, 320 (4th Cir.2010) (citing cases for proposition that Eighth Amendment requires nutritionally adequate food). In determining whether an Eighth Amendment violation has occurred, "[c]ourts consider the amount and duration of the deprivation of food." *Lockamy v. Rodriguez,* 402 F. App'x 950, 951 (5th Cir.2010) (citation omitted) (finding deprivation of six meals in fifty-four hour period insufficient to state a claim absent allegation of injury as a result of missing meals); *see Berry,* 192 F.3d at 506–08 (finding deprivation of eight meals over seven-month period insufficient to state an Eighth Amendment claim absent specific allegations of physical harm).

FN13. Evans fails to put forth evidence that Defendants Jabe, Robinson, Everett, Vargo, Shanks, and Halsey–Harris acted personally in the deprivation of his Eighth Amendment rights. Evans fails to introduce evidence that Defendants Jabe, Robinson, Everertt, Vargo, Shanks, and Halsey–Harris personally provided him with inadequate food or had any role in food service or food delivery to inmates. *See Wright,* 766 F.2d at 850.

**\*7** Evans fails to proffer evidence that he sustained any injury, much less a serious or significant physical or emotional injury, from Sussex II's provision of incomplete or tardy breakfast meal trays on six instances. *See Strickler,* 989 F.2d at 1381. Evans neither establishes that he lost weight or that he has suffered other adverse physical effects, nor has he put forth evidence suggesting a substantial risk to his health. *See Lockamy,* 402 F. App'x at 951 (citing *Berry,* 192 F.3d at 508). At most he claims that he received "inadequate nutrition." (Compl.1.) "[A]iry generalities [and] conclusory assertions" such as this "do not suffice to stave off summary judgment ...." *United States v. Roane,* 378 F.3d

382, 400–01 (4th Cir.2004) (citation omitted) (internal quotation marks omitted) (alterations omitted). Given that deficiency, Evans fails to establish an Eighth Amendment claim.

Moreover, Evans fails to produce evidence that Defendants knew of and disregarded an excessive risk to Evans's health. *Farmer,* 511 U.S. at 837. Evans fails to establish that Defendants actually perceived that Evans faced a substantial risk of serious harm from receiving incomplete or tardy breakfast trays on six instances. Accordingly, Claim Two will be DISMISSED.

## VI. RLUIPA AND FREE EXERCISE
### A. RLUIPA

RLUIPA provides, in pertinent part, that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person—

  (1) is in furtherance of a compelling governmental interest; and

  (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Thus, to begin, Evans must demonstrate that Defendants' actions impose a "substantial burden" on his religious exercise. In determining if Evans has met this standard, the Court must answer two questions: "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial'?" *Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir.2004); *see Couch v. Jabe,* 679 F.3d 197, 200–01 (4th Cir.2012) (employing similar two-part inquiry). As discussed below, on the current record, Evans lacks entitlement to relief on his RLUIPA claim.

### B. Whether the Burdened Activities Constitute a Religious Exercise

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, wheth-

er or not compelled by, or central to, a system of religious belief.' " *Couch,* 679 F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Evans's claim implicates one activity: receiving "sufficient calories, and meals served within the religiously required time period during the Muslim holy month of Ramadan." (Compl.1.) In support of his claim, Evans alleges, in sum, that he received six tardy or incomplete breakfast trays during the ten-day lockdown that took place within the greater thirty-day Ramadan celebration. (Compl.1–2.)

**\*8** Celebrating Ramadan and engaging in fasting during the day as part of Ramadan constitute a religious exercise. *Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir.2006) (citation omitted). The breaking of the fast after sundown with an evening meal also likely qualifies as a religious exercise. Evans, however, fails to demonstrate that eating a third meal prior to sunrise amounts to a religious exercise. Nevertheless, as discussed below, Evans fails to establish that the occasional absence of a meal outside of the fasting period imposes a substantial burden on his religious exercise.

### C. Evans Fails to Demonstrate a Substantial Burden on His Religious Exercise

RLUIPA provides no definition of the term "substantial burden." *See Couch,* 679 F.3d at 200. The United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See Lovelace,* 472 F.3d at 187. Thus, the Fourth Circuit has explained that a substantial burden

is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion ... on the other hand.

*Couch,* 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace,* 472 F.3d at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

187). In conducting the substantial burden inquiry, the plaintiff "is not required ... to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown,* 496 F. App'x 322, 325 (4th Cir.2012) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 725 n. 13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious ... observance was more than an inconvenience to one's religious practice." *Smith v. Allen,* 502 F.3d 1255, 1278 (11th Cir.2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir.2004)); [FN14] *see Krieger,* 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs" (citing *Lovelace,* 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his or her religion. *Living Water Church of God v. Charter Twp. of Meridian,* 258 F. App'x 729, 739 (6th Cir.2007).

> FN14. In *Sossamon v. Texas,* 131 S.Ct. 1651, 1663 (2011), the Supreme Court abrogated *Smith's* ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

Evans fails to establish that his receipt of six incomplete or tardy breakfast trays after daylight fasting began placed a substantial burden on his celebration of Ramadan or participation in the thirty-day fast. Instead, as discussed below, Evans demonstrates nothing "more than an inconvenience on [his] religious practice." *Smith,* 502 F.3d at 1278 (citing *Midrash Sephardi, Inc.,* 366 F.3d at 1227).

**\*9** Evans fails to establish that Sussex II's deprivation of a timely or complete breakfast tray on six mornings during the greater thirty-day Ra-

madan observance caused him to modify his behavior and violate his religious beliefs. Inmates observing Ramadan, like all other inmates, received 2700 to 2800 calories daily. (Shear Aff. ¶ 5.) The evidence reflects that during Ramadan, Muslim inmates engaged in fasting between sunrise and sunset. (Vargo Aff. ¶ 6.) To accommodate these inmates, Sussex II provided: (1) a pre-dawn meal before fasting started; (2) a dinner meal after sunset to break the daily fast; and, (3) that inmates observing Ramadan received a bag meal later at night that could be taken back to living areas and consumed by the inmates in the next four hours. (Vargo Aff. ¶¶ 5–6; Encl. A, at 2.) Thus, the record establishes that on the six mornings that Evans received incomplete breakfast or breakfast served after dawn, Evans received two additional religiously appropriate meals after the fast ended each day.

No evidence exists that Evans was prevented from fasting or participating in the observance of Ramadan. Although Evans alleges that he received "inadequate nutrition" during the lockdown due to tardy or late breakfast meal trays (Compl.1), conclusory allegations of this ilk fail to create a material dispute of fact. *See United States v. Roane,* 378 F.3d 382, 400–01 (4th Cir.2004) (citation omitted). Evans admits that he was able to participate in the fast as he complains that his failure to receive inadequate or late breakfast trays caused him to have no food until after sunset. (Compl.1–2.) Although Evans was dissatisfied with the quantity of food provided, Evans puts forth no evidence that his failure to receive a morning meal on six days imposed a substantial burden on his participation in the fast or in the celebration of Ramadan. *See Norwood v. Strada,* 249 F. App'x 269, 271–72 (3d Cir.2007) (finding no substantial burden when inmate denied seven religiously certified (halal) meals during three-day lockdown); *Garnica v. Wash. Dep't of Corr.,* ––– F.Supp.2d ––––, 2013 WL 4094324, at \*16–17 (W.D.Wash. Aug. 13, 2013); *cf. Neal v. McKune,* No. 11–3155–JTM, 2013 WL 1446791, \*5–6 (D.Kan. Apr. 9, 2013) (finding no substantial burden, but "an inconvenience," when inmate al-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

leged three missed and six hurried breakfasts during Ramadan in light of the availability of religiously acceptable dinner.)

For the reasons stated above, Evans fails to demonstrate that his receipt of tardy or incomplete breakfast trays substantially pressured him " 'to modify his behavior and to violate his beliefs.' " *Couch,* 670 F.3d at 200 (quoting *Lovelace,* 472 F.3d at 187). Because Evans fails to demonstrate a substantial burden upon his religious exercise, Claim Three will be DISMISSED.

**D. Free Exercise**

Similar to RLUIPA, in order for Evans to survive summary judgment for his First Amendment claim, Evans must demonstrate Defendants' conduct substantially burdens his religious exercise. *Whitehouse v. Johnson,* No. 1:10cv1175 (CMH/JFA), 2011 WL 5843622, at *5 (E.D.Va. Nov. 18, 2011). "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* (citing *Lovelace,* 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe v. Reisch,* 581 F.3d 639, 657–58 (8th Cir.2009) (citing *Patel v. U.S. Bureau of Prisons,* 515 F.3d 807, 813 (8th Cir.2008)). Accordingly, Claim 1(a) will be DISMISSED.

**E. Evans's Claim for Injunctive Relief Is Moot**

*10 Evans's RLUIPA claim arises from six isolated instances occurring from August 31, 2010 to September 8, 2010, while Sussex II was on lockdown. The lockdown and Ramadan observance ended on September 9, 2010. (Vargo Aff ¶ 7.) In 2011, 2012, and 2013, Sussex II was not placed on lockdown status during the Ramadan observance. (Vargo Supp'l Aff. ¶ 9.) Neither Evans, nor the record, establishes ongoing interference under RLUIPA with his religious fasting requirements. Indeed, the record establishes no complaints from

Evans during the Ramadan observances of 2011, 2012, or 2013. (*Id.*)

" '[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the out-come.' " *Incumaa v. Ozmint,* 507 F.3d 281, 286 (4th Cir.2007) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969). "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Id.* (quoting *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)). Thus, "[o]nce an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of the claim." *Id.* at 287 (holding transfer or release moots claim for injunctive relief under RLUIPA). FN15 Neither Evans, nor the record, establishes ongoing interference with his religious fasting requirements under RLUIPA. Thus, Evans's RLUIPA claim for injunctive relief is DISMISSED AS MOOT. *See, e.g., Garnica,* 2013 WL 4094324, at *18 (finding RLUIPA claim "moot as Ramadan 2010 has long since passed").

> FN15. If Evans demonstrates the action is " 'capable of repetition, yet evading review,' " his claim may not be moot. *Incumaa,* 507 F.3d at 289 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.,* 551 U.S. 449, 462 (2007)). Nevertheless, such a showing requires a " 'demonstrated probability' " that the allegedly improper action "will reoccur again, and to the same complainant." *Id.* (quoting *Murphy v. Hunt,* 455 U.S. 478, 483 (1982)). That showing is not made here. The record reflects no further incident in providing Evans with meals during the last three years of the Ramadan observance.

**VII. CONCLUSION**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 202023 (E.D.Va.)
**(Cite as: 2014 WL 202023 (E.D.Va.))**

Defendants' Supplemental Motion for Summary Judgment (ECF No. 53) will be GRANTED. Evans's Third Motion for an Extension of Time will be DENIED. (ECF No. 67).

An appropriate Order will accompany this Memorandum Opinion.

E.D.Va.,2014.
Evans v. Jabe
Slip Copy, 2014 WL 202023 (E.D.Va.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Booker WILSON, Plaintiff,
v.
WOODBOURNE CORRECTIONAL FACILITY;
Donald Depolo, Defendants.

No. 9:11–CV–1088 (DNH/ATB).
March 21, 2012.

Booker Wilson, pro se.

James J. Seaman, Asst. Attorney General for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendant Depolo violated plaintiff's First Amendment right to practice his religion and subjected him to excessive force in violation of the Eighth Amendment. (Compl.; Dkt. No. 1). Plaintiff claims that defendant Depolo engaged in this conduct because he does not like Muslims. Plaintiff seeks compensation for pain and suffering. (Compl.¶ 8).

Presently before the court is defendant Depolo's FN1 motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 14). Plaintiff has responded in opposition to the motion. (Dkt. No. 17). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint in its entirety with prejudice.

> FN1. Defendant Depolo is the only remaining defendant. The complaint was dismissed as against Woodbourne Correction-

al Facility by Judge Hurd's Order, dated November 15, 2011. (Dkt. No. 5).

**DISCUSSION**

**I.** *Facts*

In the complaint, plaintiff alleged that defendant Corrections Officer Depolo "misuse[d] his power" when he withheld plaintiff's Ramadan meal for one and one half hours. Plaintiff states that he had been fasting due to the Ramadan Holiday, and the meal that would have broken the fast was delayed from 8:17 p.m. until 9:45 p.m. (Compl.¶ 6). In his response to defendant's motion to dismiss, plaintiff states that this incident occurred on August 2, 2011. FN2

> FN2. Defendant pointed out in his memorandum of law that the complaint did not specify a particular date for the alleged conduct. (Dkt. No. 14–1 at 3; CM/ECFassigned pages).

Plaintiff also claims in the complaint that defendant Depolo threw away all plaintiff's "good stuff," including a pair of "medical boots" that were purchased for plaintiff by the State after an operation on plaintiff's feet. FN3 Plaintiff alleges that defendant Depolo put handcuffs on plaintiff too tightly when taking him to shower and to recreation. (*Id.*) Plaintiff claims that defendant always gave him "hate looks," made a "gun sign" with his hands, and called plaintiff a "terrorist" because he is Muslim. Plaintiff states that the 23 days he spent in the "Box" was "hell," and that he did not enjoy his Ramadan at all because of defendant's conduct. (*Id.*)

> FN3. In plaintiff's response to the motion to dismiss, he alleges that on August 26, 2011, when plaintiff was being moved to another housing area, defendant Depolo forced plaintiff to wear boots that were not his. (Dkt. No. 17 at 4). In his response, plaintiff further states that when he asked

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

about his medical boots, defendant Depolo stated that he did not "know where they were." (*Id.*) From this statement, plaintiff assumed that defendant Depolo threw away plaintiff's boots "to be evil." (*Id.* at 5).

After the complaint was filed, plaintiff sent a letter to the court stating that Woodbourne Correctional Facility ("Woodbourne") returned his property on September 29, 2011. (Dkt. No. 4). Plaintiff states that he did get his medical boots back, but some of his unspecified "stuff" was "still missing." (*Id.*) Plaintiff's response to defendant's motion is unclear. Part of the document is typewritten, and part of the document is written in plaintiff's handwriting, but many of the facts in the typewritten portion are duplicative of the handwritten facts.[FN4] In the response, plaintiff clarifies that the date defendant allegedly delayed plaintiff's Ramadan meal was August 2, 2011, and the date that plaintiff was denied his medical boots appears to have been August 26, 2011.[FN5] (Dkt. No. 17 at 3, 4).[FN6] Plaintiff states that defendant Depolo abused his authority, violated the " 'officer & employee manual and (74 of the public health law.)' Unlawful exaction of Domination)." (Dkt. No. 17 at 1).

FN4. The court notes that in the typewritten portion of the plaintiff's response, he mentions that when he was arguing with defendant Depolo about the medical boots, the defendant stated that "he didn't care about all of that this is punishment from Ramadan and snitching on him to the Sgt. which is really his buddy." (Dkt. No. 17 at 2). This is the first, and only time, that plaintiff mentions anything that approaches a claim of retaliation for "snitching." There is absolutely no basis for this claim, and neither the complaint, nor any of plaintiff's handwritten documents mention this. Such a conclusory allegation of "retaliation," to the extent that plaintiff would have wished to add it to his complaint would be dis-

missed on the pleadings. *Gill v. Pidlypchak,* 389 F.3d 378, 380 (2d Cir.2004) (citation omitted). Claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)). Additionally, any claim of retaliation is further weakened by the fact that plaintiff's boots were returned to him three days later on September 29, 2011. (Dkt. No. 4).

FN5. Plaintiff alleges that defendant Depolo made plaintiff wear other boots. (Dkt. No. 17 at 5).

FN6. The court will refer to the pages of documents as assigned by the court's electronic filing system CM/ECF.

## II. *Motion to Dismiss*

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### III. *Religion*

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct. 17, 2007). The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

**\*3** The withholding of a single meal, however, is at most, a *de minimis* burden on plaintiff's reli-

gious expression. *See, e.g., Evans v. Albany Cty. Corr. Fac.,* No. 05–CV1400, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (receipt of "wrong meals" approximately 18 out of 354 times is *de minimis* and not actionable under First Amendment); *Ward v. Goord,* No. 9:06–CV–1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan. 13, 2009) ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Odom v. Dixion,* No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (failure to provide inmate kosher meals on 7 out of 33 occasions not sufficient under First Amendment or RLUIPA [FN7]); *Thomas v. Picio,* No. 04–CV–3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (assuming inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion). *See also Norwood v. Strada,* 249 F. App'x 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere de minimis intrusion" that failed to substantially burden the inmate's religious beliefs). *Cf. Ford v. McGinnis,* 352 F.3d 582, 594 n. 12 (2d Cir.2003) (whether an inmate's religious beliefs were burdened by a prisonss refusal to serve a meal for the Eid ul Fitr feast was a question of fact, but noting that the "feast is sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisonerss religious dietary restrictions was found to be a *de minimis* burden").

> [FN7]. The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N .Y. Apr. 22, 2008). In this case, plaintiff never mentions RLUIPA, but to the extent that the court could interpret such a claim, it would also be subject to dismissal. Delaying plaintiff's meal for one and one half hours is, at worst, an inconvenience, not a substantial burden.

In this case, plaintiff claims that defendant Depolo does not like Muslims, and as a result, *one*[FN8] of plaintiff's Ramadan meals was *delayed* for approximately one and one half hours. Plaintiff claims that he was scheduled to break his fast by eating at 8:17 p.m., but did not eat until 9:45 p.m. This delay is a *de minimis* burden on plaintiff, and he states no constitutional or statutory violation as a result. Thus, plaintiff's First Amendment Freedom of Religion claim may be dismissed.

FN8. Although the typewritten portion of plaintiff's response states that he was "denied" his meal on "two different occasions" (Dkt. No. 17 at 1—typewritten portion of plaintiff's response), there is no indication from plaintiff's complaint or any other handwritten document that plaintiff was "denied" any meals. It is clear that the Ramadan meal was merely delayed (Dkt. No. 1 at ¶ 6; Dkt. No. 17 at 3—handwritten portion of plaintiff's response), and there is no indication when, if ever, another meal was denied. In any event, even assuming that one meal was delayed and another was denied, the deprivation does not rise to the level of a constitutional violation.

## IV. *Tight Handcuffs*

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v.. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**\*4** In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. at 327 (citation omitted); *Hudson,* 503 U.S. at 9. However, "the malicious use of force to cause harm constitute [s][an] Eighth Amendment violation per se" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

Plaintiff alleges that defendant Depolo placed handcuffs on plaintiff too tightly when escorting plaintiff to recreation or to the shower. The court need not reach the subjective element of the standard for excessive force. Plaintiff's allegation, without more, that defendant Depolo put handcuffs on too tightly is clearly *de minimis,* and is certainly not "repugnant to the conscience of mankind." Although overly tight handcuffing may constitute excessive force,[FN9] in order to rise to the constitutional level, it must cause some injury beyond temporary discomfort. *See Schy v.. Vermont,* 2 F. App 'x 101, 101–102 (2d Cir.2001) (painful handcuffing for two hours does not violate the Constitution); *Lynch ex rel. Lynch v. City of Mt. Vernon,* 567 F.Supp.2d 459, 468 (S.D.N.Y.2008) (citing cases); *Wang v. Vahldieck,* No. 09–CV–3783, 2012 WL 92423, at *7 (E.D.N.Y. Jan. 9, 2012) (dismissing excessive force claim where there was no physical injury associated with the tight handcuffs); *Cunningham v. McCluskey,* No. 05 Civ. 10169, 2011 WL 2791336, at *7 (S.D.N.Y. June 22, 2011) (tight handcuffing was not excessive force where plaintiff suffered no physical injury as a result). Plaintiff in this case does not allege any injury that occurred as a result of these "real tight" handcuffs. (Compl.¶ 6). These allegations do not even approach stating a claim for excessive force, and any such claim may be dismissed.

> FN9. Courts have considered the following factors in making the determination of whether a "tight handcuff" claim rises to

the level of excessive force. *See Ahmad v. Port Authority of New York and New Jersey,* No. 09–CV–3134, 2011 WL 7080691, at *7 (E.D.N.Y. Dec. 7, 2011). Courts consider whether the handcuffs were unreasonably tight; the defendants ignored the individual's pleas regarding the tightness of the cuffs; and the degree of injury to the wrist. *Id.* (citations omitted). Plaintiff in this case never claims that he requested defendant to loosen the cuffs, and there is no injury asserted.

## V. *Verbal Harassment*

**\*5** Verbal abuse and harassment, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996). In this case, plaintiff alleges that defendant gave him "hate looks" and made a "gun sign." According to plaintiff, he looks like Osama Bin Laden, but he has never had any trouble until being incarcerated at Woodbourne. Even if the defendant did give plaintiff "hate looks" or made a threatening "gun sign," plaintiff alleges no injury as a result, and that form of harassment does not state a constitutional claim. Plaintiff's allegations of verbal harassment may be dismissed.

## VI. Property

The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post-deprivation procedure. *Hudson v. Palmer,* 468 U .S. 517, 533 (1984). New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.1983); *see also* N.Y. Ct. Cl. Act § 10(6) (McKinney 1998).

Plaintiff claimed that defendant Depolo "threw away" plaintiff's good stuff, including his medical boots.[FN10] However, in a letter dated October 3,

2011, plaintiff stated that his property (including the medical boots) was returned to him, although some was still missing. (Dkt. No. 4). Clearly, based on plaintiff's own letter, defendant Depolo did not "throw away" plaintiff's medical boots, and plaintiff has not articulated what "stuff" was still missing from his property. However, even if some of plaintiff's property were not returned to him, he would have an adequate post-deprivation remedy in the Court of Claims, and any remaining property claims may be dismissed.

> **FN10.** Plaintiff also refers to this claim as "medical negligence" although he does not allege that he suffered any harm as a result of wearing different boots. Because plaintiff's boots were returned to him, and it does not appear as though defendant Depolo was even involved in the deprivation, the court will not address the issue of medical care.

### VII. State Law Violations

A violation of state law, even assuming that one existed, does not necessarily rise to the level of a constitutional violation. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).

In plaintiff's response to defendant's motion to dismiss, he alleges that the defendant violated the "officer and employee manual" and section 74 of the Public Health Law. (Dkt. No. 17 at 1). It is unclear to which "manual" plaintiff is referring, and there is no section 74 of the New York Public Health Law. Even assuming that the court could decipher plaintiff's allegation, at best, he is claiming that the defendant violated state law without any further explanation. This claim may also be dismissed for failure to state a constitutional claim.

### VIII. Opportunity to Amend

**\*6** The court should not dismiss a *pro se* action without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim may be asserted. *Parrino v. Sun Gard Availability Services, L.P.,* No. CV 11–3315, 2012 WL 826946, at \*4 (E.D.N.Y. Feb. 16, 2012) (citing *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)). In this case, even under a liberal reading of the complaint, there is no way that plaintiff could state a claim regarding his medical boots or any of his other property items, because it is clear by plaintiff's own admission, that his boots were returned to him, and defendant Depolo had nothing to do with the deprivation.[FN11] Plaintiff's claim of verbal harassment also fails to state a claim, and there is no way a claim could be stated based on the facts that plaintiff alleges. Plaintiff's claim that a religious meal was delayed for one and one half hours may not be the basis for a constitutional claim, regardless of amendment. Plaintiff has not stated any injury as the result of his "real tight" handcuffs, and his claim that defendant violated state law will not rise to the level of a constitutional violation. Thus, this court will recommend dismissal without giving plaintiff the opportunity to amend his complaint.

> **FN11.** The court also notes that plaintiff's response to the defendant's motion to dismiss, dated March 1, 2012 contains some misleading statements. Plaintiff continued to state that defendant threw plaintiff's boots away and adds that he did this to "be evil." (Dkt. No. 17 at 5). However, plaintiff's letter, dated October 3, 2011 states that Woodbourne returned his property to him, including his medical boots. Thus, it is unclear why plaintiff would still be claiming on March 1, 2012 that defendant threw away plaintiff's boots to be "evil" when plaintiff was well aware by that time, that defendant did not throw away plaintiff's property.

**WHEREFORE,** based on the findings above,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)
**(Cite as: 2012 WL 1377615 (N.D.N.Y.))**

it is

 **RECOMMENDED,** that defendant's motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 14) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE.**

 Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

N.D.N.Y.,2012.
Wilson v. Woodbourne Correctional Facility
Not Reported in F.Supp.2d, 2012 WL 1377615 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2012 WL 1366590 (N.D.N.Y.)
**(Cite as: 2012 WL 1366590 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Booker WILSON, Plaintiff,
v.
Donald DEPOLO, Woodbourne Correctional Facil-
ity, Defendant.

No. 9:11–CV–1088.
April 19, 2012.

Booker Wilson, Sonyea, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, James Seaman, Esq., Ass't
Attorney General, of Counsel, Albany, NY, for De-
fendant.

***DECISION and ORDER***
DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this action pursuant to 42
U.S.C. § 1983. On March 21, 2012, the Honorable
Andrew T. Baxter, United States Magistrate Judge,
advised, by Report–Recommendation, that defend-
ant's motion to dismiss be granted and plaintiff's
complaint be dismissed in its entirety. No objec-
tions to the Report–Recommendation were filed.

Based upon a careful review of the entire file
and the recommendations of the Magistrate Judge,
the Report–Recommendation is accepted in whole.
*See* 28 U.S.C. 636(b)(1).

Therefore it is

ORDERED that

1. Defendant's motion to dismiss is GRANTED;
and

2. Plaintiff's complaint is DISMISSED with pre-
judice.

The Clerk is directed to file a judgment dis-
missing the complaint and close the file.

IT IS SO ORDERED.

N.D.N.Y.,2012.
Wilson v. Depolo
Not Reported in F.Supp.2d, 2012 WL 1366590
(N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Orrel EVANS, Plaintiff,
v.
ALBANY COUNTY CORRECTIONAL FACIL-
ITY; Mary Kay Weis, Kitchen Supervisor; James
Campbell, Sheriff; T. Rockwell, ISU; Gloria
Cooper, Medical Supervisor; and Thomas Wigger,
Jail Administrator, Defendants.

No. 9:05–CV–1400.
May 14, 2009.

Orrel Evans, Coxsackie, NY, pro se.

Thuillez, Ford, Gold, Butler & Young LLP, Kelly
M. Monroe, Esq., of Counsel, Albany, NY, for De-
fendant Gloria Cooper.

Roche, Corrigan McCoy & Bush, Robert P. Roche,
Esq., of Counsel, Albany, NY, for Remaining De-
fendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se*
prisoner civil rights action are (1) Defendant
Cooper's motion for summary judgment (Dkt. No.
53), (2) the remaining Defendants' motion to dis-
miss for failure to state a claim and/or for summary
judgment (Dkt. No. 54), (3) United States Magis-
trate Judge David E. Peebles's Re-
port–Recommendation recommending that Defend-
ant Cooper's motion be granted, and that the re-
maining Defendants' motion be granted in part and
denied in part (Dkt. No. 66), and (4) Defendants'
timely Objections to the Report–Recommendation
(Dkt. No. 67). For the reasons set forth below, the
Report–Recommendation is adopted in part, De-
fendants' motions for summary judgment are gran-
ted in their entirety, and Plaintiff's Second

Amended Complaint is dismissed in its entirety.

**I. BACKGROUND**

**A. Relevant Procedural History**

On November 9, 2005, Plaintiff filed this ac-
tion against Albany County Correctional Facility
("ACCF") and five individuals employed by Al-
bany County. On July 13, 2007, Plaintiff amended
his Complaint for the second time. (Dkt. No. 27.)
Generally, in his Second Amended Complaint,
Plaintiff claims that Defendants violated his rights
under the First, Eighth and Fourteenth Amendments
by failing to provide him on a regular basis with a
vegetarian diet which, he maintains, was necessit-
ated by both an allergy to certain foods and his
genuinely held religious beliefs. (*Id.*) More spe-
cifically, Plaintiff alleges that this failure (1) in-
fringed upon his right to freely exercise his chosen
religion, as guaranteed by the First Amendment to
the United States Constitution, (2) exposed him to
cruel and unusual punishment and/or deliberate in-
difference to a serious medical need, in violation of
the Eighth Amendment, and (3) denied him equal
protection under the law, as guaranteed under the
Fourteenth Amendment. (*Id.*)

On October 2, 2007, Defendants filed their An-
swer to Plaintiff's Second Amended Complaint.
(Dkt. No. 31.) On May 15, 2008, Defendant Gloria
Cooper filed a motion for summary judgment pur-
suant to Fed.R.Civ.P. 56. (Dkt. No. 53.) The
next day, the remaining Defendants filed a motion to
dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6) and, in the alternative, a mo-
tion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 54.)

On January 30, 2009, Magistrate Judge Peebles
issued a Report–Recommendation recommending
that Defendants' motions be granted in part and
denied in part. (Dkt. No. 66.) Specifically, Magis-
trate Judge Peebles recommended that (1) all claims

against Defendant Cooper be dismissed, (2) all claims against Defendant ACCF be dismissed, (3) Plaintiff's Fourteenth Amendment claim be dismissed, and (4) a trial be held on Plaintiff's remaining First and Eighth Amendment claims because of the existence of genuine issues of material fact. Familiarity with the grounds of the Report–Recommendation is assumed in this Decision and Order.

On February 12, 2009, Defendants (other than Defendant Cooper) filed their Objections to the Report–Recommendation. (Dkt. No. 67.)

**B. Undisputed Material Facts**
**\*2** Plaintiff was incarcerated at the ACCF on June 30, 2005. Upon intake, the staff at ACCF performed a medical screening of Plaintiff. During his screening, Plaintiff filled out a medical history and screening form.FN1 On the form (which he signed), Plaintiff indicated that he had no allergies, medical or otherwise, and further indicated that he did not require any special diet. On July 3, 2005, Plaintiff submitted a Health Services Request Form to the medical department.FN2 This form did not reference any special/vegetarian diet.

FN1. (Dkt. No. 54, Part 8, at 5.)

FN2. (*Id.* at 12–13.)

On July 5, 2005, Plaintiff sent a letter to the Inmate Services Unit ("ISU"), in which he indicated—for the first time—that he was a vegetarian.FN3 Generally, there are at least four separate types of vegetarian diets offered at ACCF.FN4 In addition, there are at least three separate "vegetarian style" diets, which either include the use of fish, cheese or eggs.FN5

FN3. (Dkt. No. 54, Part 7, at 26.)

FN4. (Dkt. No 54, Part 2, at 3–4.)

FN5. (*Id.*)

On July 7, 2005, Plaintiff submitted a second

Health Services Request Form, which again made no reference to any special/vegetarian diet.FN6 However, on July 8, 2005, Plaintiff submitted a third Health Services Request Form that did indicate that he was a vegetarian, in addition to being allergic to meat and eggs.FN7 On that same day, the medical department wrote an order for Plaintiff to receive a vegetarian diet.FN8

FN6. (Dkt. No. 54, Part 8, at 14.)

FN7. (*Id.* at 15.)

FN8. (*Id.* [noting that a slip was sent].)

On July 20, 2005, Plaintiff submitted a letter to Defendant Rockwell at ISU, in which he complained that it took "years" for him to get his food.FN9 On July 29, 2005, Plaintiff submitted a letter to ISU, indicating that he was not receiving the proper meals, even though the medical department had indicated that he was a vegetarian.FN10 On that same day, ISU provided the letter to the kitchen supervisor and to the medical department. ISU also sent a letter to Plaintiff, informing him that his letter had been sent to the "kitchen and medical supervisor," and that his card on his "tier is marked for a rasafarian [sic] vegitarian [sic] diet."FN11

FN9. (Dkt. No. 54, Part 7, at 28.)

FN10. (*Id.* at 30.)

FN11. (*Id.* at 31.) The Court notes that Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, the particular dietary requirements of his Rastafarian religion.

On July 30, 2005, the medical department prepared a Special Diet Request Form for Plaintiff, which indicated that Plaintiff should receive a vegetarian diet, and should not receive any animal products.FN12 However, according to Plaintiff, on August 5, 2005, he "again did not receive a meal because [,] according to an unknown correctional

officer, there was nothing in the kitchen stating Plaintiff was to receive vegetarian meals." FN13 Plaintiff unsuccessfully "tried explaining his situation regarding him not receiving his and having his name removed from the vegetarian diet list to an unknown supervising officer making rounds." FN14

FN12. (Dkt. No. 54, Part 8, at 10.)

FN13. (Dkt. No. 27, ¶ 24 [Plf.'s Second Am. Compl.].)

FN14. (Id. at ¶ 25.)

As a result, Plaintiff submitted a Health Services Request Form to the medical department on August 20, 2005. FN15 In this Health Services Request Form, Plaintiff indicated that the "wrong meal" was being sent to him. The form was reviewed by the medical department on August 22, 2005. Defendant Cooper noted on the form that, according to the department's records, Plaintiff had already been placed on a vegetarian diet since August 5, 2005. FN16 However, according to Plaintiff, even after submitting a grievance on August 20, 2005, regarding the receipt of the wrong meals, he "continued to have problems receiving, and quality of his meals." FN17

FN15. (Dkt. No. 54, Part 8, at 16.)

FN16. (Id.)

FN17. (Dkt. No. 27, ¶ 27 [Plf.'s Second Am. Compl.].) The Court notes that, in Plaintiff's last letter to Defendant Rockwell dated September 19, 2005, Plaintiff explained that he had to wait "over 30 minutes or more" for a "court sandwich that was so old bread hard and falling apart." (Dkt. No. 54, Part 7, at 33.) In the same letter, Plaintiff explained that on another occasion, he "had to wait over 40 minutes [to receive his meal] then they sent over a dirty tray. I don't no [sic] who the hell they think they are dealing with

that way." (Id.)

*3 In early September 2005, Plaintiff submitted a Health Services Request Form complaining of skin irritation on his face and arm. FN18 The form did not mention any allergy, or problems with his vegetarian/special diet. After receiving the form, the medical department saw Plaintiff and gave him ointment for an acne breakout.

FN18. (Dkt. No. 54, Part 8, at 17.)

On October 13, 2005, Plaintiff submitted another Health Services Request Form regarding a problem with urinating. FN19 The form made no mention of any allergy, or problems with his vegetarian/special diet. On October 14, 2005, Plaintiff was seen for this complaint.

FN19. (Id. at 18.)

According to Plaintiff, "[o]n October 20, 2005, [he] received a 'supposed' vegetarian meal" that was actually "badly burnt eggs and pears." FN20

FN20. (Dkt. No. 27, ¶ 28 [Plf.'s Second Am. Compl.].)

In addition, attached as an exhibit to his unsworn opposition memorandum of law, Plaintiff has provided the Court with a calendar, in which he has circled 72 days between June 29, 2005, and October 20, 2005, on which he asserts he either (1) "miss[ed]" a meal, or (2) received his meal late. FN21 The Court notes that, apart from not being attached to an affidavit, the calendar fails to specify which days Plaintiff missed a meal, and which days he simply received his meal late. In addition, the calendar fails to specify whether he missed the meal because (1) he was not given a meal at all, or (2) he was not given the (presumably vegetarian) meal he requested. Finally, the calendar indicates that Plaintiff did not receive a timely meal at ACCF on June 29, 2005 (though incarcerated there at the time), which appears inaccurate because he was not incarcerated at ACCF until June 30, 2005.

Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)
**(Cite as: 2009 WL 1401645 (N.D.N.Y.))**

FN21. (Dkt. No. 57, Part 2, at 7, 30.)

In any event, in their memorandum of law in support of their motion for summary judgment, Defendants concede that Plaintiff did not receive a vegetarian meal on a few occasions.FN22 Furthermore, in their reply papers, Defendants attempt to quantify the extent of this deprivation by indicating that Plaintiff did not receive the proper meal "a half dozen or so times."FN23

FN22. (Dkt. No. 54, Part 4, at 3.)

FN23. (Dkt. No. 59, at 2.) The Court notes that, in their Objections, Defendants offer (for the first time) evidence in support of this estimate, although the Court declines to consider this late-blossoming record evidence, pursuant to the legal standard described below in note 26 of this Decision and Order. (*See, e.g.,* Dkt. No. 67, Part 1, ¶ 8 [Roche Affid.]; Dkt. No. 67, Part 5, ¶¶ 8–9 [Clark Affid.]; Dkt. No. 67, Part 8 [Ex. C to Clark Affid.]; Dkt. No. 67, Part 9, ¶ 7, 10, 11, 12 [Weis Affid.].)

As a result of the foregoing treatment, Plaintiff alleges that he lost thirty (30) pounds between June 28, 2005, and October 2005.FN24 Plaintiff also alleges that he suffered from migraine headaches, and dizziness because of his hunger.FN25

FN24. (Dkt. No. 27, ¶ 33 [Plf.'s Second Am. Compl.].) Plaintiff alleges that the departmental medical staff at Downstate Correctional Facility (where Plaintiff was transferred on October 25, 2005) has a record of his weight, which supports his weight loss claim. (*Id.*)

FN25. (*Id.* at ¶ 14.)

## II. APPLICABLE LEGAL STANDARDS

## A. Standard of Review on Objection from Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).FN26 When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).FN27 Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN26. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present ad-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ditional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN27. *See also Vargas v. Keane,* 93–CV–7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

## B. Standard Governing Motion to Dismiss for Failure to State a Claim

**\*4** After the pleadings are closed, a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is properly brought as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983) [citations omitted]; *see also* Fed.R.Civ.P. 12(b), 12(c). However, the motion for judgment on the pleadings is then decided according to the same standard as is a motion to dismiss for failure to state a claim. *Id.*

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211 nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)

[emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212 n. 17 [citations omitted]. The main purpose of this rule is to "facilitate a proper decision on the merits." *Id.* at 212 n. 18 [citations omitted].FN28

> FN28. *See also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ( "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ( "[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. *Id.* at 212 n. 20 [citations omitted]. However, even this liberal notice pleading standard "has its limits." *Id.* at 212 n. 21 [citations omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. *Id.* at 213 n. 22 [citations omitted].

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965 [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [citations omitted].[FN29]

> **FN29.** *See also Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) ("[The Supreme Court] is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.* ").

**\*5** As have other Circuits, the Second Circuit has recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN30] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551

U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted; emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965 n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level.[FN31]

> **FN30.** *See, e.g., Jacobs v. Mostow,* 271 F. App'x 85, 87 (2d Cir. March 27, 2008) (in *pro se* action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

> **FN31.** For example, in *Erickson,* the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care. *Erickson,* 127 S.Ct. at 2199–2200. Expressed differently, the

Court held that such a plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication (a requirement that had been imposed by the district court). This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief. Prior to the Supreme Court's decision, numerous decisions, from district courts within the Second Circuit alone, had found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). The important thing is that, in *Erickson,* even the *pro se* plaintiff was required to allege some sort of fact.

Finally, in reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. This standard is applied with even greater force where the plaintiff alleges civil rights violations and/or where the complaint is submitted *pro se.* However, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), FN32 it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.FN33 Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedur-

al rules that even *pro se* civil rights plaintiffs must follow.FN34 Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214 n. 28 [citations omitted].

FN32. *Sealed Plaintif v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

FN33. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN34. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted], *accord,*

*Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

## C. Standard Governing Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

**\*6** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more

than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se.*[FN35] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.[FN36] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[FN37] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement[FN38]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[FN39]

FN35. *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04–1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97–CV–1741, 2004 U.S. Dist. LEXIS 20746, at \*12–13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04–CV–1144, 2006 U.S. Dist. LEXIS 9147, at \*1–4, 2006 WL 395269

(N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371–372 (N.D.N.Y.2003) (Hurd, J.).

FN36. *Krug v. County of Rennselaer,* 04–CV–0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept.18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant is not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted].

FN37. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532

(1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ( "*[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them ."); [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ( "[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

FN38. Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered para-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

graphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

FN39. *See, e.g., Hassig v. N.Y.S. Dep't of Envtl. Conservation,* 01–CV–0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04–1773, 2005 WL 290210 (2d Cir. Feb.2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12–13, 15, *aff'd,* No. 04–1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99–CV–1913, 2003 WL 21402561, at *1, 3–4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99–CV–1913, Order, at 2–3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04–1008, 115 F. App'x 521 (2d Cir. Dec.23, 2004); *Krug,* 2006 WL 2669122, at *2–3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2–3, 2006 WL 395269; *Singleton v. Caron,* 03–CV–0455, 2005 WL 2179402, at *3–4 (N.D.N.Y. Sept.5, 2005) (Peebles, M.J.), *adopted by* 03–CV–0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00–CV–1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00–CV–1240, Decision and Order, at 1–2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96–CV–1634, 1998 WL 743710, at *1 n. 2 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96–CV1812, 1998 WL 566773, at *1 n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a] [3] "to carry out the conduct of

its business").

## III. ANALYSIS

### A. Plaintiff's First Amendment Claim

Plaintiff claims that Defendants violated his rights under the Free Exercise Clause of the First Amendment by denying him food consistent with his Rastafarian faith. The First Amendment guarantees the right to free exercise of religion. U.S. Const. amend. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citation omitted). This protection extends "into ... aspects of prison life including, pertinently, that of an inmate's diet ...." *Ward v. Goord,* 06–CV–1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan.13, 2009) (Hurd, J.) (citation omitted). "The Second Circuit has held that it is clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ward,* 2009 WL 102928, at *9 (citation omitted). Therefore, "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Johnson v. Guiffere,* 04–CV–0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007) (Hurd, J.) (internal quotation marks and citation omitted). "A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand." *Guiffere,* 2007 WL 3046703, at *4 (citation omitted).

**\*7** "Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework." *Id.* at 5 (citation omitted). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

fringes on his or her sincerely held religious beliefs." *Id.* (citations omitted). "Importantly, in evaluating this factor the court must be wary of questioning the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds, and instead may only consider whether the particular plaintiff holds a belief which is religious in nature." *Id.* (internal quotation marks and citations omitted). Stated another way, "[t]he freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984). Rather, a subjective test must be employed to determine whether the disputed conduct infringes on the plaintiff's sincerely held religious beliefs. *See Ford v. McGinnis,* 352 F.3d 582, 589–90 (2d Cir.2003).

"Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Guiffere,* 2007 WL 3046703, at *5 (citations omitted). "In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)." *Id.* (citations omitted).

"Under *Turner,* the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective." *Id.* (internal quotation marks and citation omitted). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question." *Id.* (citation omitted). "Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others guards and inmates in the prison." *Id.* (internal quotation marks and citation omitted). "Decisions rendered since *Turner* have clarified that[,] when applying this test, a court should examine 'the existence of alternative means of facilitating exercise of the right that have only a

*de minimis* adverse effect on valid penological interests.' " *Id.* (citations omitted).

With all of this in mind, it is important to note that "[t]here may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored." *Tafari v. Annets,* 06–CV–11360, 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008) (quoting *McEachm v. McGuinnis,* 357 F.3d 197, 203 n. 6 [2d Cir.2004] ). "In this respect, this area of the law is no different from many others in which the time-honored maxim *de minimis non curat lex* applies." *McEachm,* 357 F.3d at 203 n. 6.

**\*8** Here, as an initial matter, Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, that the disputed conduct infringed on his sincerely held religious beliefs. In particular, Plaintiff has not alleged or established how the meals that he received were actually "wrong." For example, Plaintiff has not alleged or established that the meals were "wrong" because they were not in conformity with his Rastafarian faith, or because they contained a product to which he is allergic. Nor has Plaintiff alleged or established how receiving non-vegetarian meals infringed on his sincerely held religious beliefs. *See Benjamin v. Coughlin,* 905 F.2d 571, 580 (2d Cir.1990) (dismissing Rastafarians' "dietary claim" asserting they had constitutional right to observe "Ital," because plaintiffs "failed to clearly define the claim or to make the evidentiary showing required to establish any constitutional dietary claim").

In any event, Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, that the "wrong meals" he (allegedly) received constituted a burden that was anything more than *de minimis* in nature. As explained above in Part I.B. of this Decision and Order, Plaintiff has not established (or even alleged) the number of "wrong meals" that he (allegedly) received.[FN40] As also explained above in Part I.B., in their motion for summary judgment, Defendants

concede that Plaintiff was denied vegetarian food during "a few of his meals." Furthermore, in an effort to quantify the extent of this deprivation, Defendants estimate that Plaintiff received the "wrong meal" about "a half dozen or so times."

> FN40. As explained above in Part I.B. of this Decision and Order, the closest Plaintiff comes to doing so is when he provides the Court with a calendar, in which he has circled 72 days between June 29, 2005, and October 20, 2005, on which he asserts he either (1) "miss[ed]" a meal, or (2) received his meal late.

For the sake of argument, the Court will assume that the number of "wrong meals" were *three times* the number of "wrong meals" conceded by Defendants, which would be the equivalent of one "wrong meal" per week for each of the 18 weeks that Plaintiff was incarcerated at ACCF. What is as significant as the number of "wrong meals" is the time period over which they occurred. Here, such "wrong meals" were not delivered to Plaintiff consecutively. Rather, Plaintiff asserts they were delivered over the course of Plaintiff's incarceration at ACCF, from June 30, 2005, until October 25, 2005—a time period of approximately 118 days. Given that Plaintiff was supposed to receive three meals per day, Plaintiff was supposed to receive approximately 354 meals while at ACCF. Assuming that Plaintiff received the "wrong meal" approximately 18 out of 354 times, the Court finds that a rational juror could not conclude that the resulting burden on Plaintiff's religious beliefs was anything more than *de minimis.*

In the analogous case of *Odom v. Dixion,* the Western District of New York held that the New York State Department of Correctional Services' failure to provide a prisoner with Kosher meals on seven out of 33 occasions (i.e., over an eleven-day time period) did not "support a § 1983 violation under either the First Amendment or RLUIPA." *Odom v. Dixion,* 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb.15, 2008) (noting that deprivation

was due to "an administrative error based on [the prisoner's] failure to timely advise [the facility's] food service personnel of his brief confinement on keeplock status"). Other courts have issued similar rulings. *See, e.g., Norwood v. Strada,* 249 F. App'x. 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-onehalf-day emergency lock-down, was "a mere *de minimis* intrusion" that failed to substantially burden the inmate's religious beliefs); *Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (affirming summary judgment for defendants because denial of pork-free meal on three occasions out of 810 meals constituted *de minim is* burden, where the denials were caused by "institutional shortage," and plaintiff "has not alleged a routine or blanket practice of denying him pork-free meals."); *Thomas v. Picio,* 04–CV–3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar.26, 2008) (assuming that inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion); *Omar v. Casterline,* 414 F.Supp.2d 582, 593 (W.D.La.2006) ("[T]he refusal to hold three meals [until sunset] because of Ramadan states only a *de minimis* imposition on ... free exercise rights.") . FN41

> FN41. *Cf. Tafari,* 2008 WL 2413995, at *16 (denial of Kosher meals on a few separate occasions "did not substantially burden [Plaintiff's] religious beliefs and constituted, at most, a *de minimis* violation."); *Ward,* 2009 WL 102928, at *9 ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Peterson v. Price,* 06–CV–0106, 2007 WL 2893009, at *6 (N.D.W.Va. Sept.28, 2007) ("[T]he failure to provide inmates with one or two kosher meals does not rise to the level of a constitutional claim.").

**\*9** For each of these alternative reasons,

Plaintiff's First Amendment claim is dismissed.

## B. Plaintiff's Eighth Amendment Claim

Plaintiff claims that Defendants violated his Eighth Amendment rights in two separate ways. First, he claims that, by denying him food consistent with his vegetarian diet, which was approved by the medical department at ACCF, he was denied the right to adequate prison conditions. Second, he claims that, by knowingly being allowed to lose significant weight, he was denied the right to adequate medical care. The relevant legal standard governing both claims is the same.

"The Eighth Amendment prohibits 'cruel and unusual punishments' in the course of incarceration." *Labounty v. Gomez,* 94–CV–3360, 1998 WL 214774, at *2 (S.D.N.Y. May 1, 1998). "To bring a cause of action pursuant to Section 1983 of Title 42, United States Code, for a violation of the Eighth Amendment's prohibition, a plaintiff must establish that the deprivation of which he is complaining is 'sufficiently serious' to constitute cruel and unusual punishment and that a defendant's actions in allowing the deprivation must have amounted to deliberate indifference." *Labounty,* 1998 WL 214774, at *2 (citing *Farmer v. Brennan,* 511 U.S. 825, 114 [1994, 114 S.Ct. 1970, ——— ———, 128 L.Ed.2d 811, ——— ———] ). "Thus, there is an objective and subjective component to the test." *Id.* (citing *Rivera v. Senkowski,* 62 F.3d 80, 84 [2d Cir.1995] ).

"The denial of a medically proscribed diet may constitute an Eighth Amendment violation under certain circumstances." *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15–16 [2d Cir.1983] ) (other citations omitted). Likewise, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles,* 725 F.2d at 15–16 [citations omitted]; *see also Chapdelaine v. Keller,* 95–CV–1126, 1998 WL 357350, at *12 (N.D.N.Y. Apr.16, 1998) (Sharpe, M.J.) ("[T]he Eighth Amendment requires that prisoners receive

nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it"). However, "[m]ere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation." *Abdush–Shahid,* 933 F.Supp. at 180.

To establish a valid claim that the denial of food (or the denial of a medically proscribed diet) constitutes an Eighth Amendment violation, one must establish that there was a "sufficiently serious condition" that resulted from the food not being received. *See, e.g., Labounty,* 1998 WL 214774, at *2. A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citations omitted). FN42

> FN42. *See also Bost v. Bockelmann,* 04–CV–0246, 2007 WL 527320, at *8 (N.D.N.Y. Feb.20, 2007) (Sharpe, J.) (concluding that, although Plaintiff allegedly lost fifteen pounds in two days, "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's food intake and weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation"); *cf. Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (Kahn, J.) (material issue of fact existed with regard to inmate's Eighth Amendment claim because evidence showed that inmate was deprived of two out of three meals per day for eight days); *Moss v. Ward,* 450 F.Supp. 591, 594, 597 (W.D.N.Y.1978) (material issue of fact existed with regard to inmate's Eighth Amendment claim because evidence showed that inmate was completely deprived of food for four consecutive days,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and was given only one meal a day for next three days).

If Plaintiff is able to establish a "sufficiently serious condition," he must also establish "that corrections personnel intentionally denied, delayed access to, or interfered with the [receipt of food]." *Abdush–Shahid,* 933 F.Supp. at 180; *see also Portuondo,* 151 F.Supp.2d at 213. Stated another way, deliberate indifference requires more than "negligent oversight." *Bockelmann,* 2007 WL 527320, at *10. In addition, a showing of deliberate indifference requires more than just "vague and conclusory allegations." *Labounty,* 1998 WL 214774, at *2. Finally, it is worth noting that a plaintiff has "a duty to inform [facility] staff that he was not receiving his medically prescribed diet," and if he "fail[s] to do so[,] ... [d]eliberate indifference does not exist." *Labounty,* 1998 WL 214774, at *2.

**1. Whether Plaintiff's Weight Loss Constitutes a Serious Medical Need**

**\*10** As an initial matter, Plaintiff's claim that he is allergic to meat and eggs is problematic because the admissible record evidence before the Court fails to establish a diagnosis by any medical professional that Plaintiff suffers from allergies to meat or eggs. *See Bockelmann,* 2007 WL 527320, at *8 (noting, as an initial problem to Plaintiff's claim that his medical condition constitutes a serious medical need, that "the record before the court fails to disclose a diagnosis by any medical professional that [Plaintiff] suffers from a medical condition requiring the high calorie diet which he so persistently sought"). The only proof that Plaintiff has offered that supports his claim that he is allergic to meat and eggs is his statement to medical staff, as well as the letters he wrote to Defendant Rockwell, indicating that he is allergic to meat and eggs. (Dkt. No. 54, Part 7, at 26, 28, 30, 32.) Apart from the conclusory and self-serving nature of this "evidence," it should be noted that (1) Plaintiff failed to inform Defendants of this alleged allergy for roughly a week, despite having multiple opportu-

nities to do so, and (2) he affirmatively indicated during his screening on June 30, 2005, that he did not suffer from any allergies.

However, even assuming that Plaintiff is indeed allergic to meat and eggs, and was entitled to a vegetarian diet for that reason, the only harm that he has alleged as a result of being deprived vegetarian meals on an unspecified number of occasions is that he lost thirty (30) pounds over a four-month period, and that this weight loss contributed to him suffering migraine headaches and dizziness. There are three problems with this alleged harm.

First, although Plaintiff claims that Downstate Correctional Facility has a record of his weight, which supports his weight loss claim, Plaintiff has failed to adduce admissible record evidence establishing this loss of thirty pounds. Second, the record reflects that, at no point in any of the complaints that Plaintiff filed between July and October 2005, or during any of his visits with medical staff, did Plaintiff indicate that he had lost any weight or was experiencing headaches or dizziness. Finally, Plaintiff does not adduce admissible record evidence establishing (or even allege facts plausibly suggesting) that he has been unable to gain weight since leaving ACCF, or that the headaches and dizziness have persisted since October 2005.

As a result, even assuming that Plaintiff lost thirty pounds and experienced dizziness and headaches over a four-month period (from June 30, 2005 to October 25, 2005), as the District Judge Gary L. Sharpe of this Court concluded *Bost v. Bockelmann,* the undersigned concludes that "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Bockelmann,* 2007 WL 527320, at *8.

**2. Whether Defendants Were Deliberately Indifferent to any of Plaintiff's Serious Medical Needs**

**\*11** Even if the Court were to find a question

of fact as to whether Plaintiff's weight loss constituted a sufficiently serious condition, the Court could not find any admissible record evidence establishing that Defendants were deliberately indifferent to this condition. When viewing the record in the light most favorable to Plaintiff, the Court finds that, during his incarceration at ACCF, Plaintiff (1) wrote four letters to Defendant Rockwell at ISU, (2) complained twice to unidentified corrections officers about his food, and (3) notified the medical staff that he was receiving the "wrong meals" one time in a Health Services Request Form. *See* Part I.B. of this Decision and Order.

Based on these undisputed facts, the Court finds that there is at least a question of fact as to whether there were certain days on which Plaintiff did not receive vegetarian meals. However, the Court also finds that "[t]here is no evidence in the record ... to suggest that this deprivation was deliberate and calculated to deprive the plaintiff of the nourishment constitutionally required and necessary to avoid ... weight loss, as distinct from the result of negligent oversight[,] which does not rise to a level of deliberate indifference." *Bockelmann,* 2007 WL 527320, at *10. "Simply stated, the evidence is lacking that any of the constituent groups sued in this action, including the county defendants, prison medical personnel, and the food service providers at [ACCF], were both cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed ... diet would result in a substantial risk of serious harm." *Bockelmann,* 2007 WL 527320, at *10.

In support of this finding, the Court makes four points. First, of the four letters that Plaintiff wrote to ISU, two focused almost exclusively on the quality of the food he received,[FN43] and another was the first letter that he sent to ISU, notifying them that he was a vegetarian. (Dkt. No. 54, Part 7, at 26, 28, 33.) The remaining letter, written on July 29, 2005, explained that Plaintiff was a vegetarian and implied that Plaintiff had problems receiving veget-

arian meals. (Dkt. No. 54, Part 7, at 30.) However, neither this letter, nor any of the other letters, in any way stated that Plaintiff was losing weight, or suffering from other side-effects as a result of receiving the "wrong meal." (Dkt. No. 54, Part 7, at 26, 28, 30, 32, 33, 35, 38, 40, 42.)

> FN43. "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *Bockelmann,* 2007 WL 527320, at *10 (citing *LeMaire v. Maass,* 12 F.3d 1444, 1456 [9th Cir.1993] [other citation omitted] ).

Second, the Court notes that Plaintiff indicated on August 20, 2005, in a Health Services Request Form, that "everyday they send up the wrong meal." The record reflects that, after filling out this form, Plaintiff filled out Health Services Request Forms on two separate occasions (once in early September 2005 and once on October 13, 2005). On neither occasion did Plaintiff mention that he was still receiving the "wrong meal." The Court finds this fact material because, if Plaintiff was having a problem with his meals, based on the fact that he had previously notified the medical department in a Health Services Request Form of his problem, it would be reasonable to expect that he would have again voiced this problem to the medical department.

**\*12** Third, the record reflects that, in all of the visits that Plaintiff had from the medical department throughout his four-month stay at ACCF, never once did he speak of weight loss, or mention other side-effects that he was suffering as a result of receiving the "wrong meal."

Finally, the record reflects that Defendant Rockwell took action to make the kitchen staff and medical staff aware of Plaintiff's issues; the medical staff also took action to so notify the kitchen staff; and the kitchen staff did not intentionally deprive Plaintiff of his vegetarian diet.[FN44] Simply stated, whatever harm Plaintiff suffered cannot be attrib-

uted to anything more than negligence, which, again, is not actionable under the Eighth Amendment.

> FN44. In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff argues that "a screw up or simple negligence or inadvertent failure to provide food or care as requested automatically [gives rise] to a deprivation of constitutional privilege." However, the law is clear that simple negligence does not rise to the level of deliberate indifference. *See Bockelmann, 2007 WL 527320, at \*10.* Rather, deliberate indifference is a state of mind akin to criminal recklessness. *Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003); Hathaway v. Coughlin* ("Hathaway II"), 99 F.3d 550, 553 (2d Cir.1996).

For all of these reasons, Plaintiff's Eighth Amendment claims are dismissed.

**C. Plaintiff's Fourteenth Amendment Claim**

Magistrate Judge Peebles recommended that the Court dismiss Plaintiff's Fourteenth Amendment claim that Defendants' refusal to adhere to the Court Order that he receive a special vegetarian diet associated with his religious practices violated Plaintiff's right to equal protection under the law. Neither party has objected to this recommendation. As a result, the Court reviews the recommendation for clear error, and finds no such error. Accordingly, for the reasons set forth in Magistrate Judge Peebles's Report–Recommendation, Plaintiff's Fourteenth Amendment claim is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles's Report–Recommendation (Dkt. No. 66) is **ADOPTED in part,** as described above; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt.Nos.53, 54) is **GRANTED** in

its entirety; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 27) is **DISMISSED** in its entirety. The clerk is directed to enter judgment and close this case.

N.D.N.Y.,2009.
Evans v. Albany County Correctional Facility
Not Reported in F.Supp.2d, 2009 WL 1401645 (N.D.N.Y.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Jonathan ODOM, Plaintiff,
v.
Thomas DIXION, Don Lopes, Jeff Sekuterski, C.
Jabcuga, C. Petties, Sgt. Markowski, and John Doe,
Defendants.
No. 04-CV-889F.

Feb. 15, 2008.
Jonathan Odom, Auburn, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York,
Kim S. Murphy, Assistant Attorney General, of Counsel,
Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.
        ***JURISDICTION***
    *1 On October 24, 2005, the parties to this action
consented to proceed before the undersigned. The
matter is presently before the court on Defendants' motion for
summary judgment (Doc. No. 47), filed December 14,
2006.

        ***BACKGROUND and FACTS***[FN1]

        FN1. The Facts are taken from the pleadings and
        motion papers filed in this action.

        Plaintiff Jonathan Odom ("Plaintiff") commenced this
civil rights action on November 8, 2004, pursuant to 42
U.S.C. §§ 1983 and 1985, alleging Defendants, employees
of the New York State Department of Corrections
("DOCS"), at Attica Correctional Facility ("Attica"),
where Plaintiff was then incarcerated, violated his
constitutional rights by denying him properly prepared
kosher meals in accordance with Plaintiff's religious
beliefs, and by harassing and retaliating against Plaintiff

when he filed grievances regarding the alleged denial of
such meals. The Complaint names as Defendants
Lieutenant Thomas Dixon [FN2] ("Lt.Dixon"), Attica Food
Services Administrator II Donald Lopes ("Lopes"),
Correction Officer ("C.O.") Christopher Jabcuga
("Jabcuga"), Sergeant S. Markowski ("Sgt.Markowski"),
C.O. Corey Petties ("Petties"), Sergeant Jeff Sekuterski
("Sgt.Sekuterski"), and John Doe ("Doe"). Plaintiff
specifically alleges as his First Cause of Action a denial of
the right to freely exercise his religion in violation of the
First Amendment and the Religious Freedom Restoration
Act ("RFRA"), 42 U .S.C. § 2000bb et seq., and a denial
of equal protection in violation of the Fourteenth
Amendment, and, as his Second Cause of Action,
retaliation for filing grievances in violation of the First
Amendment, and an Eighth Amendment excessive force
claim.

        FN2. Incorrectly spelled as "Dixion" in the
        Complaint's caption and allegations.

        The gravamen of Plaintiff's religious freedom and
equal protection claims concerns his kosher diet, referred
to as the "cold alternative diet" or "CAD." On September
1, 2004, Plaintiff filed Inmate Grievances Nos. 47427-04
and 47428-04 ("the Grievances"), complaining about the
manner in which the CAD meals were provided to
Plaintiff. According to Plaintiff, Defendants failed to
provide Plaintiff with the proper utensils to open
hermetically sealed kosher food packs, or with hot water
for his instant oatmeal and coffee, permitted a non-Jewish
inmate to prepare Plaintiff's kosher food, in violation of
the dietary rules of the Jewish religion ("the kashrut"),
deprived Plaintiff of a proper meal with which to break his
fast during Yom Kippur on September 25, 2004, failed to
provide Plaintiff with kosher meals while in keeplock on
October 1, 6, 7, 10 and 11, 2004, and refused to permit
Plaintiff to take certain food items from the assigned mess
hall to Plaintiff's cell. Complaint, First Cause of Action.
As for the retaliation and excessive force claims, Plaintiff
alleges that Defendants retaliated against Plaintiff for
filing the Grievances regarding the alleged kosher food
plan violations, including the denial of kosher meals,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

threatening Plaintiff with bodily harm if he continued to pursue his grievances, and, on October 15, 2004, flooding Plaintiff's cell with water, and physically assaulting Plaintiff, causing Plaintiff to sustain injuries. Complaint, Second Cause of Action.

**\*2** In support of Plaintiff's allegation that he has exhausted all available administrative remedies relative to his claims as required under the Prison Litigation Reform Act of 1986 ("the PLRA"), 110 Stat. 1321 (1996), codified at 42 U.S.C. § 1997e, Plaintiff attaches to the Complaint a copy of a letter from DOCS Inmate Grievance Program Director Thomas G. Eagen, dated October 12, 2004, acknowledging receipt of Plaintiff's correspondence dated September 29, 2004, pertaining to two inmate grievances, specifically, Grievances Nos. 47427/04 and 47428/04 ("the grievances"), raising the issues alleged in this action, and advising that Plaintiff's concerns asserted in the grievances had already been addressed by the Inmate Grievance Program Supervisor on September 30, 2004.

In a Decision and Order filed May 24, 2005 (Doc. No. 13) ("May 24, 2005 Decision and Order"), District Judge Charles J. Siragusa, *sua sponte,* converted Plaintiff's RFRA claim to a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("the RLUIPA"), 42 U.S.C. § 2000cc-1, and permitted the First Cause of Action asserting Plaintiff's claims under the RLUIPA, and the First and Fourteenth Amendments, to proceed only against Defendants Dixon, Lopes and Jabcuga, dismissed such claim as against the other Defendants, thereby dismissing the First Amendment and RLUIPA religious claims and the Fourteenth Amendment equal protection claim against Defendants Sekuterski, Petties, Markowski and Doe. May 24, 2005 Decision and Order at 5-8. Judge Siragusa, also *sua sponte,* permitted Plaintiff's Second Cause of Action alleging First Amendment retaliation and Eight Amendment excessive force claims to proceed only against Defendants Dixon, Markowski and Petties, and dismissed such claims as to the remaining named Defendants, *i.e.,* Lopes and Jabcuga. *Id.* at 8-11. Finally, Judge Siragusa dismissed Plaintiff's § 1985 conspiracy claim as against all Defendants for failing to allege with any specificity that any "meeting of the minds" occurred as required for a conspiracy under § 1985. *Id.* at 12-13.

On December 14, 2006, Defendants filed the instant motion for summary judgment (Doc. No. 47) ("Defendants' motion"), along with a Memorandum of Law (Doc. No. 48) ("Defendants' Memorandum"), a Statement of Undisputed Facts (Doc. No. 49) ("Defendants' Statement of Facts"), and the Declarations of Lt. Dixon (Doc. No. 50) ("Dixon Declaration") with attached exhibits A through P ("Dixon Declaration Exh(s). __"), Attica Registered Nurse Vance Hawley (Doc. No. 51) ("Hawley Declaration"), Jabcuga (Doc. No. 52) ("Jabcuga Declaration"), Lopes (Doc. No. 53) ("Lopes Declaration"), Markowski (Doc. No. 54) ("Markowski Declaration"), Rabbi Arthur Morgenstern ("Rabbi Morgenstern") (Doc. No. 55) ("Rabbi Morgenstern Declaration"), and Petties (Doc No. 56) ("Petties Declaration").

In light of Plaintiff's *pro se* status, on December 29, 2006, a notice to Plaintiff pursuant to Local Rule of Civil Procedures 56.2 and *Irby v. New York City Transit Authority,* 262 F.3d 412, 413 (2d Cir.2001) (Doc. No. 58) ("IRBY notice"), was mailed to Plaintiff, advising Plaintiff that Defendants had moved the court to decide Plaintiff's claims against Plaintiff, without a trial and based only on written materials submitted in support of Defendant's motion. The IRBY notice further advised Plaintiff that to avoid summary judgment being granted in Defendants' favor, it was necessary to file papers, including sworn affidavits, establishing the existence of a material issue of fact, and that any material issue of undisputed fact set forth in Defendants' Statement of Facts would be deemed admitted if not controverted by Plaintiff.

**\*3** An Order filed January 3, 2007 (Doc. No. 59), established February 16, 2007, as Plaintiff's deadline for filing a response opposing Defendants' motion, and March 2, 2007 as Defendants' deadline for filing any reply in further support of the motion. Plaintiff did not timely respond in opposition to summary judgment and, on March 1, 2007, Defendants filed the Declaration of Assistant Attorney General Kim S. Murphy ("Murphy") (Doc. No. 60) ("Murphy Declaration"), requesting summary judgment be granted in Defendants' favor and the case be dismissed. By letter filed March 8, 2007 (Doc. No. 61) ("March 8, 2007 letter"), Plaintiff advised that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

during a recent transfer between prison facilities, his legal materials and papers were destroyed such that Plaintiff was unable to further litigate the instant action, and requested the action be terminated. Accordingly, on March 9, 2007, the undersigned entered an order (Doc. No. 62) ("the Dismissal Order"), granting Plaintiff's request and directing the file be closed.

On March 19, 2007, Plaintiff filed a motion (Doc. No. 63), to vacate the Dismissal Order, explaining that the March 8, 2007 letter was intended only to advise the court of Plaintiff's inability to timely respond in opposition to Defendants' motion, rather than to request the action be terminated. Defendants' response in opposition to the motion was filed on April 3, 2007, and, on April 13, 2007, Plaintiff filed a reply in further support of the motion to vacate. By Order filed March 23, 2007 (Doc. No. 69), the undersigned granted Plaintiff's motion to vacate the Dismissal Order, and set July 31, 2007 as the deadline for Plaintiff to file a response in opposition to summary judgment, and August 31, 2007 as Defendants' deadline to file any reply.

On August 20, 2007, Plaintiff filed in opposition to summary judgment a Declaration (Doc. No. 73) ("Plaintiff's Declaration"), with attached exhibits A through M ("Plaintiff's Exh(s). ___"), a Brief in Opposition to Defendants' Summary Judgment Motion (Doc. No. 74) ("Plaintiff's Memorandum"), a Statement of Disputed Factual Issues (Doc. No. 75) ("Plaintiff's Statement of Facts"), and the Declaration of Marquis Brooks (Doc. No. 76) ("Brooks Declaration").

In further support of summary judgment, Defendants filed on September 18, 2007, the Reply Declaration of Assistant Attorney General Kim S. Murphy (Doc. No. 78) ("Murphy Reply Declaration"). On October 17, 2007, Plaintiff filed a Supplemental Declaration in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Doc. No. 79) ("Plaintiff's Surreply Declaration"), with attached exhibit A ("Plaintiff's Surreply Exh. A"). Oral argument was deemed unnecessary.

Based on the following, Defendants' motion is GRANTED in part and DENIED in part.

## DISCUSSION

### 1. Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner, supra.* The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; see *Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**\*4** "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex, supra,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

> Fed.R.Civ.P. 56(e).

Defendants are alleged to have violated Plaintiff's civil rights under 42 U.S.C. § 1983, pursuant to which an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Section 1983, however, " 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989); and *Baker,* 443 U.S. at 140). Here, Plaintiff alleges as his First Cause of Action violations of his right to religious freedom under the First Amendment, as determined by the court, and the RLUIPA, and a Fourteenth Amendment equal protection violation, and, as his Second Cause of Action, an Eighth Amendment excessive force claim, and a First Amendment retaliation claim. As discussed *infra,* summary judgment is GRANTED as to the claims asserted under the First Cause of Action, but GRANTED in part and DENIED in part as to the claims asserted under the Second Cause of Action.

**2. Religious Freedom**

**\*5** Plaintiff's religious liberty claim is asserted under both the First Amendment's Free Exercise Clause and § 3 of the RLUIPA. Preliminarily, the court observes that whether asserted under the First Amendment or the RLUIPA, a religious liberty claim requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs." Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir.2003) (First Amendment Free Exercise Clause)).[FN3]

> FN3. Because the threshold inquiry of a religious freedom claim under both the First Amendment and the RLUIPA is the same, the court does not consider whether a violation of the RLUIPA, which provides for a separate cause of action, can serve as a basis for a § 1983 claim. *See Salahuddin,* 467 F.3d at 273-75 (addressing inmate plaintiff's § 1983 religious liberty claim asserted under both First Amendment Free Exercise Clause and RLUIPA § 3, without discussing whether RLUIPA provides a basis for § 1983 action).

As relevant, § 3 of the RLUIPA provides that the government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government demonstrates that the burden furthers a compelling governmental interest by the least restrictive means. 42 U.S.C. § 2000cc-1(a); *see Salahuddin,* 467 F.3d at 273. "Religious exercise" is defined under the RLUIPA to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that received Federal financial assistance.' " *Salahuddin,* 467 F.3d at 273 n. 2 (quoting 42 U.S.C. § 2000cc-1(b)(1). "In the prison context, this section sweeps broadly as '[e]very State ... accepts federal funding for its prisons.' " *Id.* (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 716 n. 4 (2005)).

Analyzing Plaintiff's claim under the First Amendment, "[t]he Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

citizenry to explore ... religious beliefs in accordance with the dictates of their conscience.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). Because prisoners retain their right to religious freedom even when incarcerated, inmates are entitled to reasonable accommodation of their religious beliefs, consistent with needs of prisoner security, including "religious dietary beliefs, as 'prison officials must provide a prisoner a diet that is consistent with his religious scruples.' " *Jackson,* 196 F.3d at 320 (citing cases and quoting *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)).

Prisoners do not abandon their constitutional rights at the "jailhouse door," *Bell v. Wolfish,* 441 U.S. 520, 576 (1979) (Marshall, J., dissenting), although " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston,* 334 U.S. 266, 285 (1948)). As such, "a challenged prison regulation is judged 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.' " *Salahuddin,* 467 F.3d at 274 (quoting *O'Lone,* 482 U.S. at 349 (additional internal quotation marks omitted)).

**\*6** As stated, a religious liberty claim, whether asserted under the First Amendment or the RLUIPA, requires the prisoner demonstrate "that the disputed conduct substantially burdens his *sincerely held religious beliefs." Salahuddin,* 467 F.3d at 274-75 (italics added) (citing RLUIPA, 42 U.S.C. § 2000cc-1(a), and *Ford v. McGinnis,* 352 F.3d 582, 587 (2d Cir.2003) (discussing requirements of First Amendment Free Exercise Clause)). "The defendants [prison officials] then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," to shift the burden back to the inmate to "show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (citing *Ford,* 352 F.3d at 595) (internal quotations marks and brackets omitted) (bracketed material added).

**A. Sincerity of Plaintiff's Religious Beliefs**

As a threshold matter, Defendants argue that Plaintiff's alleged Jewish faith, including its kosher dietary requirements, is not a sincerely held belief, a threshold requirement for any religious freedom claim under either the First Amendment or the RLUIPA. Defendants' Memorandum at 3-5. According to Defendants, Plaintiff "did not practice any type of Judaism prior to his DOCS incarceration in 1992. On August 5, 2004, just a few months prior to the complained of actions, plaintiff switched his religious designation from Muslim to Jewish." Defendant's Memorandum at 4 (citing Dixon Declaration ¶ 4 and Exh. B). Thus, Plaintiff, as far as the prison officials at Attica were concerned, was "Jewish" for less than one month prior to the date of the earliest allegations in the Complaint. *Id.* Defendants also maintain that because DOCS kosher diet is generally considered as better than the meals provided to non-Jewish inmates in the regular prison diet, inmates have been known to convert to Judaism, by submitting forms to change, administratively, their religious preference at the correctional facility, to receive the more palatable meals. *Id.* (citing Dixon Declaration ¶ 10). Furthermore, Defendants urge the court to find that Plaintiff's religious beliefs are not sincerely held given that "[o]utside prison walls, it is very difficult for a civilian to convert to Judaism," in accordance with the requirements of Judaic law, and also in consideration of "plaintiff's extensive history of bringing frivolous lawsuits." Defendants' Memorandum at 4-5 (citing Rabbi Morgenstern Declaration ¶ 2). Plaintiff has not directly responded to this argument.[FN4]

> FN4. Plaintiff neither challenges the accuracy of Rabbi Morgenstern's interpretation of Judaic law nor disputes Rabbi Morgenstern's explanation of any of the tenets of the Jewish faith.

As discussed, Discussion, *supra,* at 10, the threshold determination to be made with regard to a religious liberty claim under either the First Amendment or the RLUIPA is whether the inmate plaintiff's religious beliefs are sincerely held. *Salahuddin,* 467 F.3d at 274-75 (RLUIPA); and *Ford,* 352 F.3d at 587 (First Amendment Free Exercise Clause). Whether an inmate's beliefs in the Jewish religion are sincerely held, however, is subjective and requires a determination of genuine issues of material

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

fact. Specifically, in a similar case in which the plaintiff inmate alleged that the defendant prison officials' refusal to provide the inmate with a kosher diet violated the inmate's right to religious freedom, the Second Circuit held that summary judgment was precluded based on a genuine issue of material fact as to whether an inmate's beliefs in the Jewish religion were sincerely held, despite the prison's Jewish chaplain's statement that the inmate's alleged conversion to Judaism was not in accordance with Judaic law as required to be considered Jewish. *Jackson,* 196 F.3d at 320-21. Similarly, in the instant case, despite the timing of Plaintiff's "conversion" and Defendants' alleged interference with Plaintiff's kosher diet, the sincerity of Plaintiff's conversion to Judaism cannot be determined without weighing facts. As such, this aspect of Defendants' motion does not warrant summary judgment.

**B. Manner in which kosher meals are provided**

**\*7** Plaintiff's allegations, under both the First Amendment and RLUIPA, that Defendants failed to provide Plaintiff with the proper utensils to open hermetically sealed kosher food packs, Complaint ¶ 10, or with hot water for his instant oatmeal and coffee, *id.,* and permitted a non-Jewish inmate to prepare kosher food by opening cans of kosher tuna and sardines, and placing the contents into paper cups, Complaint ¶¶ 17-18, essentially challenge the manner in which kosher meals are provided to him. Defendants maintain that even assuming, *arguendo,* such allegations are true, they fail to establish that Defendants substantially burdened Plaintiff's exercise of a key tenet of his religion, citing statements made by Rabbi Morgenstern in support. Defendants' Memorandum at 5-12 (citing Rabbi Morgenstern Declaration ¶¶ 4-6).

As discussed, Discussion, *supra,* at 10, both the First Amendment and the RLUIPA require that the conduct of which the inmate plaintiff complains "substantially burdens" the inmate's "sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75 (RLUIPA), and *Ford,* 352 F.3d at 587 (First Amendment Free Exercise Clause)). Although the court is precluded on summary judgment from weighing facts so as to determine the sincerity of Plaintiff's religious beliefs, *Jackson,* 196 F.3d at 320, the court is permitted to determine whether, as a matter of law, Defendants' conduct challenged by Plaintiff "substantially burdens" Plaintiff's practice of his religion

by interfering with or violating a key tenet of Judaism. *Salahuddin,* 467 F.3d at 274-75; *Ford,* 352 F.3d at 587.

According to Rabbi Morgenstern, kashrut, the Jewish dietary law governing the preparation and consumption of kosher food, makes no provision regarding where a Jewish person is to consume kosher food, and the location of Plaintiff's kosher meals "has no bearing whatsoever on [Plaintiff's] ability to practice Judaism." Rabbi Morgenstern Declaration ¶¶ 4-5. Nor is there any requirement that kosher food be prepared only by people of the Jewish faith, and not by a non-Jewish person. *Id.* ¶ 6 ("Having a non-Jewish or non-kosher person prepare or open kosher food does not make the food unkosher."). This includes the removal of lids from cans of tuna fish and sardines before serving the contents to the inmates. *Id.* Defendants maintain, and Plaintiff does not dispute, that because the lids have sharp metal edges that could be used as weapons, the removal of the lids before serving the canned foods is a legitimate penological reason, as recognized by the Supreme Court. Defendants' Memorandum at 8 (citing *O'Lone,* 482 U.S. at 353); Dixon Declaration ¶ 16. Rabbi Morgenstern further maintains that it would not offend the kashrut for an inmate who keeps kosher to request a member of the correctional facility to open hermetically sealed foods if the inmate is unable to do so with a plastic utensil. *Id.* Rabbi Morgenstern does not, however, address Plaintiff's allegations regarding the lack of hot water in the mess hall without which Plaintiff was unable to prepare his instant oatmeal, sanka coffee or tea.

**\*8** In opposition to summary judgment, Plaintiff submits a copy of an article entitled "Kashrut: Jewish Dietary Laws," ("the article") Plaintiff's Exh. A,[FN5] which Plaintiff maintains establishes that the kashrut requires inmates to eat in a kosher dining hall, and for kosher food to be prepared only by people of the Jewish faith. Plaintiff's Declaration ¶¶ 4-7. A plain reading of the article, however, reveals no mention of any requirement under the kashrut that meals are to be eaten in any particular place, or that only Jewish persons are able to prepare kosher food.

FN5. Defendants do not challenge the article as inadmissible hearsay.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

As for Plaintiff's allegations regarding the lack of hot water in the mess hall for preparation of the instant oatmeal packets, sanka coffee and tea, Defendants concede that although generally hot water for such use is made available in the mess hall, on occasion, no hot water is available in the mess halls. Lopes Declaration ¶ 9. Defendants further maintain that even if hot water is not available, inmates are permitted to have in their cells hot pots for heating water for such purposes. *Id.* Regardless of whether hot water is available for inmates to prepare instant oatmeal packets, sanka coffee or tea, Plaintiff points to nothing establishing that the consumption of such foods is required to maintain a kosher diet. Nor does the article Plaintiff submits in opposition to summary judgment specifically require such foods be made available as part of a kosher diet.[FN6] *See* Plaintiff's Exh. A, *passim.* As such, Plaintiff has failed to establish that the denial of hot water for such purpose substantially burdens the exercise of his religion as required for a religious freedom claim under either the First Amendment Free Exercise Clause or the RLUIPA.

FN6. Notwithstanding the Supreme Court's instruction to liberally construe pleadings of *pro se* plaintiffs, *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (allegations of complaint drafted by *pro se* plaintiff held to less stringent standards than formal pleadings drafted by attorneys), the court declines to construe Plaintiff's allegations regarding the lack of hot water in the mess hall with which to prepare instant oatmeal packets, sanka coffee and tea, Complaint ¶¶ 10, 15, as alleging an Eighth Amendment violation based on prison conditions. Specifically, despite Plaintiff's later assertions in papers opposing summary judgment regarding the poor quality of the food served for the kosher meals, Plaintiff's Memorandum at 8 and 12-15, as well as the Declaration of Marquis Brooks (Doc. No. 76), Plaintiff submits no evidence that he was unable to obtain nutritionally sound meals from the kosher diet or that he suffered any physical ailments as a result of the diet. Nor has Plaintiff moved to amend the Complaint to allege such a claim.

Furthermore, there is no merit to Plaintiff's contention that to the extent Plaintiff's interpretation of the kashrut differs from that endorsed by Rabbi Morgenstern, and not challenged by Plaintiff, Plaintiff's interpretation is entitled to First Amendment protection, even if it is not consistent with a generally accepted tenet of Judaism, so long as the subject belief is sincerely held by Plaintiff. Plaintiff's Memorandum at 9-12. In support of this argument, Plaintiff references *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829 (1989); *Jackson,* 196 F.3d 316, and *Patrick,* 745 F.2d 153. *Id.* Each of these cases, however, is inapposite.

At issue in *Frazee, supra,* was whether the Illinois Department of Employment Security's determination that the plaintiff's refusal to work on Sunday, where such refusal was not based on the basic tenets of an established religious sect but, rather, on the plaintiff's own personal religious beliefs given that the plaintiff was not a member of any established church or religious sect, disqualified the plaintiff from receiving unemployment benefits. In holding that the denial of unemployment benefits violated the First Amendment's Free Exercise Clause, the Court stated that *"[u]ndoubtedly, membership in an organized religious denomination, especially forbidding members to work on Sunday, would simplify the problem of identifying sincerely held religious beliefs,* but we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." *Frazee,* 489 U.S. at 834 (italics added). The Court thus implied that where, as here, the plaintiff asserts membership in an organized religious denomination, Judaism, the plaintiff must establish that the defendants' challenged conduct violates a fundamental tenet of the particular religion.

**\*9** At issue in *Jackson, supra,* was the inmate's removal from the kosher diet program based on the statement of the correctional facility's rabbi that the inmate was not Jewish according to specific criteria set forth under Judaic law, *i.e.,* that "a Jew is one who was born Jewish or has formally converted." *Jackson,* 196 F.3d at 317-18 (internal quotation marks omitted). In *Jackson,* the inmate plaintiff had, upon entering the prison system in 1986, identified himself as being of the Jewish faith and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

participated in the kosher diet program until the rabbi's determination in 1995 that Plaintiff was not Jewish. *Id.* In finding that a genuine issue of fact precluded summary judgment as to whether the inmate plaintiff's beliefs that he was Jewish were sincere, the court stated that "[a] claimant need not be a member of a particular organized religious denomination to show sincerity of belief." *Id.* at 320 (citing *Frazee,* 489 U.S. at 834). As such, the district court had erred in relying on the prison rabbi's statement that the plaintiff was not Jewish. *Id.* In other words, at issue was not whether any particular practice of the inmate plaintiff was in accordance with a sincerely held religious belief but, rather, whether the inmate plaintiff sincerely believed he was of the Jewish faith, a fact which could not be reached on summary judgment. Further, in contrast to the instant case, the plaintiff in *Jackson* was not claiming a violation of his religious liberty based on his own personal interpretation of any the tenet of the Jewish religion.

With regard to *Patrick, supra,* there the inmate plaintiff alleged the defendant prison officials interfered with the plaintiff's right to practice his religion by refusing to recognize as a religious group "the Five Percenter Nation of Islam" and, consequently, denying the plaintiff the right to gather with other inmates for worship purposes. *Patrick,* 745 F.2d at 155. Thus, the issue in *Patrick* was not whether the inmate plaintiff's religious beliefs were sincerely held but, rather, whether the "religion" the inmate practiced should be recognized as a religion, the practice of which would be entitled to First Amendment protection. Accordingly, none of these cases supports Plaintiff's assertion that, as a sincere adherent to Judaism, Plaintiff's individual interpretations of Judaism's dietary requirements must, under the First Amendment or the RLUIPA, be accepted.

Moreover, the sincerity of Plaintiff's interpretation of the kashrut as requiring him to eat in a kosher mess hall, and that the CAD meal be prepared only by people of the Jewish faith who keep kosher, is negated by Plaintiff's reliance on the article for the basis of such belief. Simply put, support for Plaintiff's interpretation of the kashrut is not found anywhere in the article, and Plaintiff's claim thus is nothing more than a conclusory assertion insufficient to survive summary judgment. Rule 56(e); *Kia v. McIntyre,*

235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."). Nor does Plaintiff dispute or challenge the validity or accuracy of Rabbi Morgenstern's interpretation of the kashrut. Further, discovery in this action has concluded and Plaintiff does not contend that he has been prevented by Defendants from obtaining the requisite evidence necessary to support his claim.

**\*10** As for Plaintiff's assertion that he was unable to open the hermetically sealed packets of meats with the plastic spoon provided, creating a further violation of his Kashrut beliefs, Complaint ¶ 10, Rabbi Morgenstern states that "[i]t would not offend kashrut for plaintiff to ask a member of the facility staff to open his hermetically sealed foods for him if he is not able to do so with a plastic spoon or fork." Rabbi Morgenstern Declaration ¶ 6. Plaintiff's conclusory assertion fails to meet his burden on summary judgment by pointing to any evidence contradicting Rabbi Morgenstern's statement. Rule 56(e); *Kia,* 235 F.3d at 763. Significantly, Plaintiff does not challenge Rabbi Morgenstern's standing to make definitive and correct statement regarding the tenets and Judaism, and its related kosher laws.

Finally, Plaintiff's later assertion in opposition to summary judgment that he was provided with non-kosher utensils with which to consume his kosher meal, in violation of the kashrut, Plaintiff's Memorandum at 13; Plaintiff's Declaration ¶ 2; Plaintiff's Statement of Facts ¶ 8, a claim not found in the Complaint, [FN7] is inconsistent with Plaintiff's allegation, Complaint ¶ 10, that only plastic spoons were provided, as well as with Defendants' assertion that inmates are provided with plastic "sporks" which are not reused and, as such, would never come into contact with any prohibited items. Murphy Reply Declaration ¶ 9. Significantly, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes,* 84 F.3d at 619. This claim is therefore without merit.

> FN7. Significantly, Plaintiff has not moved to amend the Complaint to add this claim.

Plaintiff has thus failed to point to any evidence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

establishing any genuine issue of material fact that the manner in which the kosher meals are prepared and served substantially burdens any sincerely held religious belief, constituting a major tenet of Judaism, as required to establish a claim under either the First Amendment Free Exercise Clause or the RLUIPA. Summary judgment as to this aspect of Defendants' motion is therefore GRANTED.

## C. Location where meals are to be consumed

Plaintiff's allegation that he is not permitted to take certain food items from the mess hall to his cell, including uncooked whole onions, green peppers, cucumbers, and packets of instant oatmeal, sanka coffee and tea, Complaint ¶¶ 9, 11, 15-16, challenges the location where Plaintiff is permitted to consume his kosher food. In support of summary judgment, Defendants rely on Rabbi Morgenstern's statement that neither the location of Plaintiff's meals nor Plaintiff's ability to remove food from the mess hall to consume in his cell "has [any] bearing whatsoever on his ability to practice Judaism." Defendants' Memorandum at 7 (citing Morgenstern Declaration ¶ 4). Significantly, Plaintiff points to nothing contradicting Rabbi Morgenstern's statement, nor does the article on which Plaintiff relies, Plaintiff's Exh. A, support this conclusory assertion so as to defeat summary judgment. Rule 56(e); *Kia*, 235 F.3d at 763.

**\*11** Summary judgment is GRANTED as to this claim.

## D. Failure to provide kosher meals

Plaintiff alleges that on September 25, 2004, Defendants Dixon and Lopes canceled Plaintiff's "call-out" to pick up trays of proper foods with which to break the Yom Kippur fast, Complaint ¶¶ 19-21, and that Defendant Lopes failed to provide Plaintiff with kosher meals for breakfast on October 1, 7 and 10, 2004, and dinner on October 6, 7, 10, and 11, 2004, during which time Plaintiff was in keeplock status. Complaint ¶ 22. Defendants do not deny that Plaintiff was not provided with several kosher meals upon being confined on keeplock status; rather, in support of summary judgment, Defendants contend that upon being placed on keeplock status for 15 days, beginning with September 30, 2004, Plaintiff, as a special diet inmate, was required by DOCS regulations to inform Attica's Food Service personnel of

the special diet so that appropriate arrangements could be made to provide Plaintiff with the CAD meal in his cell, but that Plaintiff failed to do so. Defendants' Memorandum at 8-9; Dixon Declaration ¶¶ 17-18, and Dixon Declaration Exhs. I and J. Because, as Defendants contend, Plaintiff failed to timely notify Attica's Food Service personnel of his kosher diet requirements, Plaintiff was temporarily removed from the CAD program, but Plaintiff only missed a few kosher meals over a five-day program resulting from the administrative error caused by Plaintiff's own lack of communication with Attica's food service personnel which, at most, constitutes negligence, and provides no basis for § 1983 relief. *Id.* In fact, in a letter dated October 12, 2004, DOCS Deputy Commissioner John H. Nuttall advised Plaintiff that although Plaintiff's paperwork indicating his religious affiliation had been changed to Jewish from Muslim had been filed, the "automated record system" had not been updated, but had since been corrected and the matter resolved. Dixon Declaration Exh. J. Plaintiff submits nothing contradicting Defendants' assertion that Plaintiff's temporary removal from the CAD program was nothing more than an administrative error based on Plaintiff's failure to timely advise Attica's food service personnel of his brief confinement on keeplock status.

It is settled that mere negligence on the part of prison officials is insufficient to establish liability under § 1983. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Poe v. Leonard*, 282 F.3d 123, 145 (2d Cir.2002). The evidence submitted by Defendants in support of summary judgment, including copies of a grievance Plaintiff filed regarding the denial of the CAD meals while in keeplock status, demonstrates no material issue of fact that such denial resulted from Plaintiff's failure to advise Attica's Food Service personnel of such status, and the fact that such confinement occurred within a short time of Plaintiff's administrative change in his religious designation from Muslim to Jewish. Dixon Declaration Exhs. I and J. The evidence also establishes that upon bringing the error to the attention of prison officials, the situation was remedied and Plaintiff received his CAD meal for the balance of his keeplock confinement. *Id.* Plaintiff offers nothing to rebut this evidence. As such, the circumstances of the instant case regarding Plaintiff's deprivation of kosher meals while in keeplock are insufficient to support a § 1983 violation under either the

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

First Amendment or RLUIPA.

**\*12** Insofar as Plaintiff maintains that Defendants "canceled" Plaintiff's "call-out" to pick up trays of kosher food with which Plaintiff was to break the Yom Kippur fast, Complaint ¶ 20, Defendants argue that neither Lt. Dixon, Lopes nor Jabcuga, the only remaining Defendants against whom this claim is asserted, were personally involved in this alleged violation of Plaintiff's religious liberty, as required for § 1983 liability. Defendants' Memorandum at 15-16. Defendants also reference a memorandum prepared by Sr. Rosalind Rosolowski, Coordinating Chaplain to the Attica Watch Commander, dated September 9, 2004, which provides that Jewish inmates are to be provided with meals proper for Jewish High Holy Days, including Yom Kippur for which the "break-the-fast" CAD meal was to be provided "one hour after sundown, [at] approximately 8:00 pm." Dixon Declaration Exh. L.FN8 That the subject meal was provided two hours later than the normal dinner hour suggests that Plaintiff may have been confused as to when he should have anticipated being called for the meal, a finding which would negate liability as to Defendants, based on the absence of causality, but which also would require a factual finding not permitted on summary judgment. The court, however, need not deny summary judgment as to this claim for a more basic reason.

> FN8. Plaintiff has not objected to the memorandum as inadmissible hearsay.

In particular, Plaintiff does not allege, and points to no evidence suggesting, that he was obligated to eat the specific "break-the-fast" meal for Yom Kippur. As such, it is not established, for the purpose of avoiding summary judgment, that the denial of the meal "substantially burdened" Plaintiff's sincerely held religious belief in any major tenet of the Jewish faith, Salahuddin, 467 F.3d at 274-75; Ford, 352 F.3d at 587, and this unintentional deprivation therefore provides no basis for liability as a violation of Plaintiff's rights to religious exercise under the First Amendment or the RLUIPA. Accordingly, summary judgment as to this aspect of Plaintiff's claim is GRANTED.

**3. Equal Protection**

As for Plaintiff's Fourteenth Amendment equal protection claim, the court observes that Plaintiff essentially alleges Defendants did not permit Jewish inmates receiving the CAD meal to remove kosher food from the mess hall to eat in their cells, while permitting inmates who eat the regular prison diet, presumably non-Jewish inmates, to do so. Complaint ¶¶ 7, 9, 11-12, 24. Plaintiff specifically maintains he was not allowed to bring to his cell his packets of instant oatmeal, sanka coffee and tea, as well as whole onions, green peppers and cucumbers, and hermetically sealed packages of meats and cheese, whereas non-Jewish inmates who eat the regular prison diet are permitted to take out of the mess hall all "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread." Id. ¶¶ 9-12. In support of summary judgment, Defendants attribute Plaintiff's equal protection claim to a misunderstanding created by the renovation of Attica's mess halls just prior to Plaintiff's changing his designated religion to Jewish from Muslim, such that during the renovations, Jewish inmates receiving the CAD diet were required, and permitted, to eat their entire kosher meals in their cells, rather than reporting to an assigned mess hall where the kosher meals are normally provided. Defendants' Memorandum at 6-7; Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Defendants further maintain that Plaintiff has failed to establish that Defendants' application of Attica's prison policies regarding security and related matters constituted intentional discrimination against Plaintiff based on his Jewish religion. Defendants' Memorandum at 14-15.

**\*13** "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." Allen v. Cuomo, 100 F.3d 253, 260 (2d Cir.1996) (citing City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985)). Inmates are not, however, similarly situated to unincarcerated persons, and "[t]he rights of prisoners are necessarily limited because of their incarceration," and "[a] state may treat differently situated people in a different way." Allen, 100 F.3d at 260 (citing cases). Establishment of an equal protection violation requires the plaintiff show "purposeful discrimination directed at an identifiable suspect class." Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir.1995) (citing cases). Although discrimination based on religion can establish an equal

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

protection violation, *Benjamin v. Coughlin,* 905 F.2d 571, 574-75 (2d Cir.1990), inmates are not a suspect class, *Allen,* 100 F.3d at 260 n. 1, and, thus, no higher level of scrutiny is required. *Turner v. Safley,* 482 U.S. 78, 81 (1987) (holding lower level of scrutiny is applied to equal protection challenges to prison rules and regulations).

Here, in support of summary judgment, Defendants explain that Plaintiff's equal protection claim is properly attributed to Plaintiff's misunderstanding regarding Attica's policy on the CAD program. Dixon Declaration ¶¶ 6-9; Dixon Declaration Exhs. C-E. Lt. Dixon explains that upon enrolling in the CAD program on August 9, 2004, Plaintiff received a memorandum from Attica Deputy Superintendent Richard Savage instructing Plaintiff that he could receive his CAD meal by reporting to Mess Hall A and passing through the "Special Diet Line," and also advising that "[m]eal attendance and strict adherence to the Alternative Diet is mandatory and will be closely monitored," and that three unexcused absences within one week's time would result in Plaintiff's suspension from participating in the program. Dixon Declaration ¶ 6; Dixon Declaration Exh. C. Lt. Dixon further explains that between April 6 and July 16, 2004, Attica's three mess halls "underwent reconstruction, followed by a cleanup period," and during this time, one mess hall would be closed for reconstruction, leaving the other two open for service. Dixon Declaration ¶ 8. According to Dixon, with the temporary closure of one mess hall, there was not sufficient room to accommodate the entire prison population, so the decision was made to feed the special diet inmates, including the CAD inmates like Plaintiff, in their cells throughout the reconstruction period while the rest of the general prison population, including the non-Jewish inmates, ate in the two open mess halls. *Id.* Upon completion of the reconstruction, the special diet inmates, including the CAD inmates like Plaintiff, were fed in Mess Hall B, according to the same prison regulations applicable to the general prison population inmates who eat the regular prison diet. *Id.* ¶¶ 8-9 and Exh. E (August 24, 2004 Memorandum from Lopes advising Plaintiff that as of August 26, 2004, Plaintiff was to report to Mess Hall B to receive his CAD meal).

**\*14** Significantly, Plaintiff submits nothing in support of his allegation that inmates within the general prison population who eat the regular prison diet (and who presumably are not Jewish), are routinely permitted to take food items from the mess halls to their cells and that inmates receiving the CAD are not. Rather, according to the "Inmate Orientation Guideline Manual, Section IV-Food Services, Messhall [*sic* ] Policy and Procedures Part 8.3" ("Food Service Policy"), Dixon Declaration Exh. F, all meals are to be provided "cafeteria style with limits placed on certain items ." Inmates are required to eat all food items selected, and although certain rationed items are permitted to be carried from the mess hall, all other food must be consumed or discarded in the mess hall. Food Service Policy Part 8.3 A maximum of four rationed items are permitted to be taken out of the mess hall, including bakery items, bread, desserts, fresh fruit, meat without sauce and sugar. *Id.* Certain foods, however, may not be removed, including bulk or scooped food, liquids (such as coffee, juice, and milk), corn on the cob, and vegetables. *Id.*

A plain reading of the Complaint reveals that none of the food items Plaintiff was prohibited from removing from the mess hall, including the instant oatmeal, sanka coffee and tea packets, and the whole onions, peppers and cucumbers, were among the list of rationed items permitted to be removed from the mess hall. Insofar as Plaintiff maintains that the peppers and cucumbers are fruits, rather than vegetables, Complaint ¶ 13, Plaintiff does not allege that any non-Jewish inmate was permitted to remove such food items from the mess hall as required to establish an Equal Protection violation. As for the CAD meal meat items Plaintiff maintains he was not allowed to remove, evidence in the record establishes that Plaintiff was permitted to remove such items once they had been opened, including the hermetically sealed meats and cheeses, and the cans of tuna fish and sardines, and that the requirement that such items be opened prior to eating was a matter of legitimate prison security concerns. *See* Dixon Declaration ¶¶ 15-16; Dixon Declaration Exhs. M and N. Furthermore, all the items Plaintiff maintains the non-Jewish inmates who received the regular prison diet were permitted to remove from the mess hall, including "fruits, hot dogs, hamburgers, cold cuts, cheese, chicken patty and bread," Complaint ¶ 12, are included on the list of rationed items permitted to be removed from the mess hall by any inmate, including Plaintiff if he chose to do so.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

Food Service Policy Part 8.3. Significantly, Plaintiff does not claim that any other general population non-Jewish inmate was allowed to remove hermetically sealed packages of meat and cheese, or unopened cans of tuna fish and sardines or any other canned foods.

According to Lt. Dixon, in August 2004, around the time that the Jewish inmates began to again receive their CAD meals from the mess hall, rather than having the meals served to them in their cells because of the diminished mess hall seating capacity attributed to the renovation of the mess halls, "CAD inmates were attempting to leave Mess Hall B with their CAD trays still wrapped." Dixon Declaration ¶ 15. Lt. Dixon advised CAD inmates, including Plaintiff, that such conduct was not allowed because of security concerns, but that once the trays were opened in the mess halls, the inmates were permitted to take the same items from the trays to their cells, *i.e.,* the rationed items, as were the non-Jewish and general prison population receiving the regular prison diet. Dixon Declaration ¶ 15. Plaintiff does not contradict Dixon's Declaration in this regard. Absent some evidence that the Food Service Policy was applied to CAD inmates in a manner different from the way it was applied to non-CAD inmates, there is no basis for Plaintiff's equal protection claim.

**\*15** On this record, Plaintiff's equal protection claim fails, and summary judgment is GRANTED.

### 4. Excessive Force

Plaintiff alleges that Defendants Dixon, Petties and Markowski repeatedly threatened and harassed Plaintiff in an attempt to coerce Plaintiff to discontinue pursuing his grievances, and that when Plaintiff failed to do so, Defendant Petties assaulted Plaintiff. Complaint ¶¶ 33-35. According to Plaintiff, Defendant Markowski ordered Petties to assault Plaintiff, and after the assault, Markowski "informed Plaintiff 'that was just a warning, so you better drop your grievances ... or the next time you won't be so lucky,' " and that " 'accidents happen,' " "advising Plaintiff " 'to be smart and drop his grievances ... and save himself [Plaintiff] a lot of trouble, or he might end up in the hospital, if he don't [*sic* ] .' " Complaint ¶¶ 36-37. Defendants argue in support of summary judgment

of Plaintiff's Eighth Amendment excessive force claim alleged against Defendants Dixon, Petties and Markowski, that Plaintiff has failed to exhaust administrative remedies relative to such claim, Defendants' Memorandum at 18, that no objective evidence substantiates Plaintiff's claim, *id.* at 19-21, and that the alleged use of force was, at most, *de minimus,* which is not actionable under the Eighth Amendment. *Id.* at 22-23. These arguments are, however, insufficient to support summary judgment.

### A. Failure to Exhaust Administrative Remedies

Defendants contend that Plaintiff's failure to exhaust available administrative remedies as to his Eighth Amendment excessive force claim requires summary judgment on such claim. Defendants' Memorandum at 18. In opposition, Plaintiff argues that he prepared and filed a grievance relative to the excessive force claim, but that Attica's "prison authorities" never forwarded the grievance to DOCS Central Office Review Committee ("the CORC"). Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14. In support of his contention, Plaintiff does not attach copies of the putative grievances but, rather, references a hand-written list of the inmate grievances he allegedly filed, including the two Plaintiff maintains pertained to the assault, *i.e.,* Inmate Grievances "47651-04-Threats" and "47825-04-Threats." Plaintiff's Memorandum at 21; Plaintiff's Declaration ¶ 14; Plaintiff's Statement of Facts ¶ 14 (all referencing Plaintiff's Exh. I). Significantly, in further support of summary judgment, Defendants assert that the fact that the disputed grievance were assigned grievance numbers negates Plaintiff's assertion that the grievances were never filed and processed. Murphy Reply Declaration ¶ 15.

Under the PLRA, exhaustion of all available administrative remedies is required before a [§ 1983](#) civil rights action challenging prison conditions, including excessive force claims, may be commenced. 28 U.S.C. § 1997e; *[Macias v. Zenk,](#)* [495 F.3d 37, 40 (2d Cir.2007)](#) (" 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " (quoting *[Porter v. Nussle,](#)* [534 U.S. 516, 532 (2002)](#)). In New York, DOCS provides a three-step review process which an inmate must exhaust prior to commencing a [§ 1983](#) action. *[Reyes v. Punzal,](#)* [206 F.Supp.2d 431, 432](#)

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

(W.D.N.Y.20002).

**\*16** Specifically, the grievance must first be submitted to the prison's Inmate Grievance Review Committee ("the IGRC"), comprised of both inmates and DOCS employees. *Reyes,* 206 F.Supp.2d at 432. If the IGRC's decision is unfavorable to the inmate, the inmate may appeal the decision to the superintendent of the relevant correctional facility. *Id.* The superintendent's decision is further appealable to the CORC which makes the final administrative decision. *Id.* Significantly, all three levels of administrative review must be exhausted before an inmate may seek § 1983 relief in federal court. *Id.* (citing cases).

Exhaustion of administrative remedies is, however, an affirmative defense, rather than a jurisdictional requirement. *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 919-20 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004). As such, if not raised as an affirmative defense, the defendants waive their failure to exhaust. *Johnson,* 380 F.3d at 695. Furthermore, as with any affirmative defense, the burden is on the defendants to establish that the plaintiff failed to exhaust. *Giano,* 380 F.3d at 675. Accordingly, in the instant case, it is Defendants' burden to establish that Plaintiff failed to exhaust administrative remedies relative to the Eighth Amendment excessive force claim.

Although exhaustion generally is mandatory, in certain situations, including where administrative remedies are not " 'available' to prisoners seeking redress of their grievances," the plaintiff's failure to exhaust is justified. *Giano,* 380 F.3d at 675 (citing 42 U.S.C. § 1997e(a)). Thus, to meet their burden on the affirmative failure to exhaust defense, Defendants must first establish that administrative remedies were available, but that Plaintiff failed to exhaust them. Significantly, the parties do not dispute that DOCS provides a formal procedure by which an inmate may seek administrative relief for grievances arising at DOCS's facilities and applicable to Plaintiff as of October 15, 2004, when Plaintiff alleges he was assaulted. Rather, Defendants, inconsistently, maintain that Plaintiff "never filed a grievance regarding this alleged assault, and he makes no allegation to the contrary

in the complaint," Defendants' Memorandum at 18, but later assert, inconsistently, that although Plaintiff contends Attica prison officials prevented him from filing any grievance regarding the alleged assault, that Plaintiff's handwritten list of the inmate grievances, Plaintiff's Exh. I, includes two grievances pertaining to the alleged assault which were assigned inmate grievance numbers establishes that such grievances were, in fact, filed. Murphy Reply Declaration ¶ 15.

The court need not, however, attempt to resolve this apparent discrepancy as such general assertions regarding Plaintiff's failure to exhaust administrative remedies is, without more, insufficient to satisfy Defendants' burden of proof on this affirmative defense. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (holding it is defendant's burden in a § 1983 action to prove, either at trial or on summary judgment, affirmative defense asserted by defendants, and plaintiff was not required to establish absence of such defense). Significantly, Defendants admit that "DOCS maintains records of grievances filed by inmates," Murphy Reply Declaration ¶ 15, yet have not submitted anything substantiating their contention that Plaintiff did not exhaust his administrative remedies as to the alleged assault, such as a log showing the absence of any such claim having been filed during the relevant period of time, an affidavit from Attica's Inmate Grievance Program ("IGP") indicating that no such claim had ever been filed, or, more significantly, that Inmate Grievance Nos. 47651-04 and 47825-04 were assigned to other claims unrelated to the alleged October 15, 2001 assault on Plaintiff or have never been assigned to any grievance. Nor do Defendants submit anything indicating that Plaintiff's claim was filed with the IGRC, and denied, and that Plaintiff failed to appeal the denial, despite, as indicated, admitting, Murphy Reply Declaration ¶ 15, that the assignment of an inmate grievance number to the disputed grievances is evidence that the grievances were, in fact, filed. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 278 (2d Cir.2003) (observing that absent statutory language to the contrary, Second Circuit would not hold that Congress intended plaintiff to carry the burden of establishing a negative proposition where such would impose an "enormous evidentiary burden," and citing cases, including *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003) (concluding Congress intended PLRA's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

administrative exhaustion requirement as an affirmative defense because, *inter alia,* prison official defendants have better access to prison records).

**\*17** Accordingly, summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust administrative remedies is DENIED.

## B. Merits of Excessive Force Claim

Having denied summary judgment on Plaintiff's Eighth Amendment excessive force claim based on failure to exhaust, the court considers the merits of the claim. Plaintiff claims that Defendant Petties, acting on Markowski's direction, assaulted him on October 15, 2004, causing Plaintiff physical injuries, including blurry vision, ringing in the ears, migraine headaches and dizziness. Complaint ¶¶ 32 and 40. Defendants argue in support of summary judgment on this claim that no objective evidence in the record supports this claim, Defendants' Memorandum at 19-21, and, in any event, there is no evidence that any force Defendant Petties used against Plaintiff on October 15, 2004 was more than *de minimus,* which is not actionable under § 1983. *Id.* at 22-23.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993).

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.2d at 104; *see Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 9. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury.

*Id.* at 9-10. The subjective component of an Eighth Amendment excessive force claim is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm, and the use of any unnecessary force is always considered excessive. *Whitley v. Albers,* 475 U.S. 312, 322 (1986) (use of force is always unreasonable where action was "taken in bad faith or for no legitimate purpose"). In fact, "the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] *per se* ... whether or not significant injury is evident.' " *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)) (brackets and ellipses in original).

Nor does an Eighth Amendment excessive force claim require any serious injury. *Whitley,* 475 U.S. at 322. Rather, a prison official's malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether any significant injury is evident. *Hudson,* 503 U.S. at 9 (citing *Whitley,* 475 U.S. 312, 327 (1986)). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury," a result as unacceptable to the drafters of the Eighth Amendment as it is today. *Id.* (citing *Estelle v. Gamble,* 429 U.S. 97, 102 (1976), and *Wilkerson v. Utah,* 99 U.S. 130, 136 (1879)).

**\*18** In evaluating Defendants' contentions directed to Plaintiff's excessive force claim, the court finds *Griffin, supra,* to be apposite. At issue in *Griffin,* was whether the District Court erred in dismissing the plaintiff inmate's § 1983 excessive force claim given that the claim was "weak" and the supporting evidence was "extremely thin." *Griffin,* 193 F.3d at 91-92. In particular, the inmate plaintiff claimed he was subjected to excessive force by two prison guards who assaulted him and then faked and inflicted injuries onto themselves to cover up the misconduct. *Id.* at 90. In that case, the inmate also had pleaded guilty in state court to criminal charges brought in connection with the incident. *Id.* at 90-91. Further, the only evidence offered in support of the claim was plaintiff's own testimony and minimal injuries of a bruised shin and some swelling over a knee. *Id.* at 91. Nevertheless, in reversing, the Second Circuit held that the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

"weakness" of the claim and "extremely thin" evidence, *i.e.,* the plaintiff's averments and minimal injury, did not preclude a reasonable jury from finding that excessive force was used against the plaintiff. *Id.* at 92.

Here, in support of summary judgment, Defendants maintain that no objective evidence in the record supports Plaintiff's claim that he was assaulted on October 15, 2004 and, as such, any force Defendant Petties used against Plaintiff on that day was, at most, *de minimus,* which is not actionable under § 1983. Defendants' Memorandum at 19-23. In opposing summary judgment on Plaintiff's claim that he sustained physical injuries as a result of the assault, including blurred vision, ringing in the ears, migraine headaches, dizziness, and pain, Complaint ¶ 40, Plaintiff maintains that Defendants have failed to refute the allegation that Petties, acting at Markowski's direction, ordered Plaintiff to the commissary so as to assault Plaintiff, and that Plaintiff's personal log of inmate grievances filed demonstrates he filed an inmate grievance regarding the assault. Plaintiff's Memorandum at 24-25; Plaintiff's Declaration ¶ 12; Plaintiff's Exh. I. Significantly, these averments are corroborated by a statement made by Attica Registered Nurse Vance Hawley ("Hawley"). Specifically, Hawley states that "[a]s the Attica nurse on duty on October 18, 2004, I performed plaintiff's medical examinations because he complained of an assault by an unnamed individual. The medical records of the examination indicate that plaintiff had subjective, unsupported complaints of ringing in the ears and blurred vision." Hawley Declaration ¶ 3. Although Plaintiff "exhibited no bruising, swelling, redness or other signs of any assault," Hawley provided Plaintiff with over-the-counter pain medication. *Id.*[FN9] Plaintiff's medical records, as related by Vance, thus corroborate Plaintiff's claim that he was assaulted on October 15, 2004 and creates a genuine issue of material fact as to whether Plaintiff was assaulted. *See Griffin,* 193 F.3d at 91-92.

FN9. While Hawley further avers that "[a] true and correct copy of plaintiff's ambulatory health record is attached hereto as Exhibit A," Hawley Declaration ¶ 3, no such exhibit is attached, nor is any copy of Plaintiff's ambulatory health record found elsewhere in the record.

**\*19** Nor is the fact that Plaintiff's medical records provide no direct evidence that Plaintiff was injured on February 28, 2004 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff complained of injuries on Monday, October 18, 2004, three days after the alleged assault on Friday, October 15, 2004, thereby presenting a reasonable basis to support an inference that the passage of time between the alleged assault and Vance's examination was sufficient for Plaintiff's injuries to heal enough as to not be readily apparent to Hawley.

Further, the statements submitted by Petties and Markowski do not preclude the possibility that Plaintiff may have been assaulted on October 15, 2004. Specifically, although Petties maintain that Plaintiff "incorrectly alleges that I assaulted him on October 15, 2004," Petties Declaration ¶ 3, Petties, without directly denying Plaintiff's allegation, only supports this assertion by pointing to the absence of any documentary evidence to the contrary. For example, Petties represents that he was not aware that Plaintiff had filed Grievances 47427-04 and 47428-04 until Petties read the Complaint. *Id.* ¶ 4. Petties also points to the absence of any "use of force report" which Petties would have been required to complete had he used force against Plaintiff, and that the completion of such report "would have prompted an investigation which never occurred." *Id.* ¶ 5. Petties further asserts that Plaintiff, incorrectly, *see* Discussion, *supra,* at 31-32, never filed any grievance regarding the alleged assault, which would have been investigated, *id.,* and that Petties was never disciplined in connection with any assault. *Id.* ¶ 6. Petties summarizes that the absence of any documentary evidence or investigation into the alleged assault "demonstrate[s] that no assault ever took place." *Id.*

Similarly, Defendant Markowski states that he "never observed any use of force by C.O. Petties on plaintiff," Markowski Declaration ¶ 4, and that Plaintiff never filed any grievance regarding the alleged assault, which would have prompted a thorough investigation into the matter. *Id.* ¶ 5. Markowski continues that he was not aware Plaintiff had filed Grievances 47427-04 and 47428-04 until he read

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

Plaintiff's complaint. *Id.* ¶ 6.

The Petties and Markowski Declarations, however, fail to demonstrate the absence of any genuine issue of material fact as to whether Plaintiff was assaulted. Rather, accepting Petties's statement implying that he did not assault Plaintiff, and Markowski's statement that he did not "observe" Petties assault Plaintiff over Plaintiff's unambiguous statement that he was assaulted by Petties, acting at Markowski's direction, would require the court to weigh evidence, which is not allowed on summary judgment. *Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199, 206 (2d Cir.2006) (" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " (quoting *Anderson,* 477 U.S. at 249)); *see Griffin,* 183 F.3d at 91-92 (court's consideration of evidence in support of plaintiff inmate's claim as "thin" was improper basis for dismissal of claim). Furthermore, Defendants' assertion that Plaintiff never filed any grievance regarding the alleged assault begs the question given that, as Defendants concede, Murphy Reply Declaration ¶ 15, Plaintiff has submitted evidence, Plaintiff's Exh. I, that a grievance pertaining to the alleged assault was both filed and assigned an inmate grievance number. *See* Discussion, *supra,* at 31-32. Simply, Petties's failure to directly deny Plaintiff's claim that he assaulted Plaintiff, while insisting that Plaintiff "incorrectly" maintains he was assaulted, and Markowski's failure to deny that he directed Petties to assault Plaintiff, and statement that he never observed such an assault attempts to 'slice the cheese' a bit too finely. Indeed, a reasonable jury could find the statements of Petties and Markowski to be evasive. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

**\*20** The subjective component of an Eighth Amendment excessive force claim requires that the defendants act maliciously and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application

of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. In evaluating a prisoner's Eighth Amendment excessive force claim, even *de minimis* force is taken in bad faith if used for no legitimate purpose. *Id.* at 322. Here, with regard to the first *Whitley* factor, it is undisputed that any injuries Plaintiff sustained as a result of the alleged October 15, 2004 use of force were *de minimus.* Nevertheless, as with the objective prong, whether Plaintiff was subjected to the use of any unnecessary force is a critical disputed fact. This unresolved factual issue as to the objective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment as it also precludes the court from making any determination as to the second, third, fourth and fifth *Whitley* factors necessary to establish the claim's subjective element.

Nothing in the record, however, indicates any personal involvement by Defendant Dixon in the alleged assault. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (to establish liability under § 1983, plaintiff must show defendant was personally involved in the alleged constitutional violation). As such, summary judgment on Plaintiff's excessive force claim is GRANTED as to Dixon.

Here, because the record establishes a genuine issue of material fact as to whether Plaintiff was subjected to any force on October 15, 2004, the court is unable to reach the issue as to whether such force was reasonable, a question that must therefore await trial. As such, summary judgment as to Plaintiff's excessive force claim is DENIED as to Defendants Petties and Markowski, but GRANTED as to Defendant Dixon.

**5. Retaliation**

Plaintiff alleges that after filing Grievances 47427/04 and 47428/04 on September 1, 2004, complaining about the manner in which the CAD meals were provided, Defendants retaliated against him by placing Plaintiff in keeplock confinement from September 30, through October 15, 2004, threatening Plaintiff with physical harm if Plaintiff did not withdraw the grievances, flooding

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

Plaintiff's cell on October 15, 2004, and that Petties assaulted Plaintiff on October 15, 2004. Complaint ¶¶ 8, 27, 31-37. Defendants argue in support of summary judgment that Plaintiff is unable to establish that Defendants took any adverse action against Plaintiff, or that any adverse action taken against Plaintiff was causally connected to Plaintiff's participation in any protected activity, in this case, his grievance filings. Defendants' Memorandum at 23-27.

**\*21** For a plaintiff to succeed in a First Amendment retaliation claim, he must show that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took adverse action against the plaintiff; and 3) there was a causal connection between the protected conduct and the adverse action. _Davis v. Goord,_ 320 F.3d 346, 352 (2d Cir.2003). Courts are properly skeptical of prisoner retaliation claims as "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." " _Dawes v. Walker,_ 239 F.3d 489, 491 (2d Cir.2001), _overruled on other grounds, Swierkiewicz v. Sorema N.A.,_ 534 U.S. 506 (2002). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." _Davis,_ 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." _Dawes,_ 239 F.3d at 493 (internal quotation marks and citations omitted).

The filing of prisoner grievances is among the conduct protected by the First Amendment and thus actionable under § 1983. _Colon v. Coughlin,_ 58 F.3d 865, 872 (2d Cir.1995). _See Smith v. Woods,_ 2006 WL 1133247, at * 10 (N.D.N.Y. Apr. 24, 2006) (extending First Amendment protection to making of oral complaints to correctional officers), _aff'd,_ 219 Fed. Appx. 110 (2d Cir.2007). As such, Plaintiff's allegations that he was subjected to retaliatory conduct for filing Grievances 47427-04 and 47428-04 satisfies the first element of the retaliation claim.

With regard to the second element requiring adverse

action, Plaintiff's alleges that Defendants threatened and harassed him to drop the grievances, flooded Plaintiff's cell with water, placed him in keeplock confinement, and that Petties, at Markowski's direction, assaulted him. Complaint ¶¶ 8, 27, 31-37; Plaintiff's Memorandum at 24-26; Plaintiff's Declaration ¶¶ 12-13. Insofar as Plaintiff maintains that Defendant Petties and Markowski threatened and assaulted Plaintiff and Defendants flooded Plaintiff's cell, such assertions satisfy the second element of a retaliation claim. _See Davis,_ 320 F.3d at 352 (the use of unnecessary force to retaliate against a plaintiff for engaging in protected activity constitutes unlawful retaliation); _Gill v. Pidlypchak,_ .389 F.3d 379, 384 (2d Cir.2004) (allegations that corrections officers made threats against inmate for filing prison grievance along with allegation that corrections officers followed through with such threats constitutes adverse action for § 1983 retaliation claim); _Woods v. Medlock,_ 2008 WL 123845, *6 (W.D.Pa. Jan. 9, 2008) (denying motion to dismiss inmate's § 1983 retaliation claim alleging defendant correctional officers placed inmate plaintiff in unlighted, flooded, filthy cell to retaliate against plaintiff's filing lawsuits).[FN10] Nevertheless, although "[a]n allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a prison grievance, states a claim under § 1983," _Gayle v. Gonyea,_ 313 F.3d 677, 682 (2d Cir.2002) (citing _Franco v. Kelly,_ 854 F.2d 584, 589-90 (2d Cir.1988)), Plaintiff's allegation that he was placed in keeplock confinement on September 30, 2004, in retaliation for filing the grievances, however, is without merit.

[FN10.] Defendants' assertion, Dixon Declaration ¶ 27, and October 16, 2004 Memorandum from DOCS Lt. J. Lambert to Sgt. K. Barbary, Dixon Declaration Exh. P, explaining that no "logical explanation why water was coming through the cell vent of Odom's cell" on October 15, 2004, and that such flooding has not reoccurred does not, as Defendants insist, Defendants' Memorandum at 25 n. 5, establish that no Defendant was responsible for the flooding of Plaintiff's cell or that such flooding was unintentional. Rather, the unexplained cause of the undisputed, but suspicious, flooding can be

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

interpreted as establishing the flooding was the result of a purposeful act. Significantly, Defendants, who possess the exclusive capability to do so, fail to explain what steps were taken to objectively investigate the issue, or any other efforts to establish the actual cause of the flooding. Surely, a competent plumber could provide a reasonable explanation. Indeed, DOCS's failure to determine the cause could be circumstantial evidence of a conscious avoidance of knowledge of Defendants' involvement.

**\*22** Essentially, such an allegation calls into question the validity of the prison violation with which Plaintiff was charged, resulting in the keeplock confinement. Plaintiff, however, has not challenged the veracity of such charges. *See Jones v. Coughlin,* 34 F.3d 677 at 679 (2d Cir.1995) (vacating and remanding district court's decision that inmate plaintiff's claim regarding filing of false misbehavior report was wholly conclusory as based solely on adverse disciplinary decision where plaintiff, although provided a hearing on the disputed disciplinary charges, "was unfairly denied the right to call key witnesses in defense of the charges against him," and, thus, had no opportunity to prove charges were false, as required before the district court could consider whether filing of false charges was intended to retaliate against the plaintiff). Further, the filing of a false misbehavior report does not constitute "a *per se* constitutional violation actionable under § 1983" provided the inmate is afforded due process protection through a disciplinary hearing on the misbehavior report. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) ("prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"), *cert. denied,* 485 U.S. 982 (1988). "The key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections [to dispute a false or incorrect charge] guaranteed by the Fourteenth Amendment." *Franco v. Kelly,* 854 F .2d 584, 587 (2d Cir.1988) (bracketed material added). Summary judgment on a retaliation claim based on the filing of a false misbehavior report, however, is improper where an inmate either is not granted a hearing

on the alleged false disciplinary charges, or is granted a disciplinary hearing, but is unfairly denied the right to rebut the charges by presenting evidence or calling witnesses in defense of the charges against him. *Jones,* 45 F.3d at 679. Here, Plaintiff does not allege that no disciplinary hearing on the charges was ever held, or that Plaintiff was denied due process in connection with such hearing. As such, Plaintiff cannot establish the second element of a retaliation claim based on his keeplock confinement and summary judgment is GRANTED as to this aspect of Plaintiff's retaliation claim.

Finally, with regard to the third element requiring a causal connection between Plaintiff's participation in the protected activity, *i.e.,* the filing of grievances, and the adverse action, the Second Circuit has held that the temporal proximity of an adverse action in relation to the filing of an inmate grievance is circumstantial evidence of a causal connection so as to establish a retaliation claim. *Colon,* 58 F.3d 872. Here, because the alleged threats, assault, and unexplained flooding of Plaintiff's cell occurred within a short time after Plaintiff filed the grievances on September 1, 2004, a material fact issue regarding the causal connection is established as to this aspect of the claim.

**\*23** As Plaintiff has demonstrated a material issue of fact necessary to establish that Defendants took adverse action against Plaintiff based on Plaintiff's grievances, *i.e.,* flooding Plaintiff's cell and threatening and assaulting Plaintiff, summary judgment on this portion of Plaintiff's retaliation claim is DENIED.

**6. Qualified Immunity**

Alternatively, Defendants argue they are qualifiedly immune from liability in the instant action. Defendant's Memorandum at 27-30. Because summary judgment is GRANTED in favor of Defendants on the Plaintiff's First Amendment and RLUIPA religious freedom claims and the Fourteenth Amendment Equal Protection claim, qualified immunity is considered only with regard to Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims. Plaintiff argues in opposition that Defendants are not qualifiedly immune from liability in the instant case because it was not

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)

(Cite as: 2008 WL 466255 (W.D.N.Y.))

objectively reasonable for Defendants to believe the actions of which Plaintiff accuses them did not violate Plaintiff's civil rights as alleged in his Second Cause of Action. Plaintiff's Response at 32-40.

The doctrine of qualified immunity "shields a government official acting in an official capacity from suit for damages under § 1983 unless the official 'violated clearly established rights of which an objectively reasonable official would have known.' " *Blouin v. Spitzer,* 356 F.3d 348, 359 (2d Cir.2004) (quoting *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003)). "The determination generally involves a two-step inquiry: do the facts alleged show the officer's conduct violated a constitutional right, and, if so, was the right in question clearly established?" *Blouin,* 356 F.3d at 359 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001) (qualified immunity does not shield government official from liability in civil rights action where alleged facts, taken in light most favorable to party asserting injury, show defendant government official's conduct violated a constitutional right that was clearly established at the time of the alleged violation)). Here, the record before the court fails to establish that qualified immunity shields Defendants from the instant litigation with regard to the Eighth Amendment excessive force claim and the retaliation claim based on threats, abuse and flooding.

In particular, at the time of the alleged constitutional violations, excessive use of force against inmates for any purpose regarding prison administration was well established. *See Hudson,* 503 U.S. at 7-8. Plaintiff's right to file an inmate grievance, including verbal complaints to prison supervisors, without fear of retaliation was equally well established at the time of the alleged events in this case. *Davis,* 320 F.3d at 352-53 (filing of prison grievances is activity protected by the First Amendment). Moreover, on this record, the court finds that if the facts pertaining to Plaintiff's excessive force claim as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights. *Saucier,* 533 U.S. at 201.

**\*24** As such, Defendants' summary judgment motion, insofar as it alternatively asserts the defense of qualified immunity, is DISMISSED as moot in regard to Plaintiff's religious freedom and equal protection claims, and the

excessive force claim as alleged against Dixon, and is DENIED as to the excessive force claim against Defendants Petties and Markowski and the retaliation claim.

### CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 47) is GRANTED in part and DENIED in part.

The parties are to appear before the undersigned on April 2, 2008 at 11:00 A.M. to schedule further proceedings. The Attorney General's Office shall make arrangements for Plaintiff to appear by telephone.

SO ORDERED.

W.D.N.Y.,2008.

Odom v. Dixon
Not Reported in F.Supp.2d, 2008 WL 466255 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln
Work-Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe # 1,
Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.
No. Civ.A. 95CV1641RSPDS.

Sept. 22, 1997.
Kenneth Brown, State Court Institute-Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

DECISION AND ORDER

POOLER, J.

*1 The above matter comes to me following a
Report-Recommendation by Magistrate Judge Daniel
Scanlon, Jr., duly filed on April 17, 1997. Following ten
days from the service thereof, the Clerk has sent me the
entire file, including any and all objections filed by the
parties herein.

Plaintiff Kenneth Brown commenced this Section

1983 civil rights action on November 17, 1995. On
February 12, 1996, Magistrate Judge Scanlon ordered
Brown to submit an amended complaint alleging the
specific acts committed by the individuals named as
defendants which Brown claimed violated his
constitutional rights. Brown filed an amended complaint
on March 21, 1996. In his amended complaint, Brown
alleged that defendants violated his rights under the Eighth
and Fourteenth Amendments by failing to process properly
his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact he
had never violated the conditions of his parole. For a more
complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams
made a motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No.
14, at 2. On August 19, 1996, defendants Bishop, Magee,
Barton, and McMahan made a motion to dismiss the
complaint against them or, in the alternative, for summary
judgment. Dkt. No. 20. On October 17, 1996, defendants
Herman, Stewart, and Stanford made a motion to dismiss
for failure to state a claim. Dkt. No 34. On April 17, 1996,
Magistrate Judge Scanlon recommended that all
defendants' motions to dismiss be granted and that the
complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave
to file a second amended complaint and a copy of his
proposed amended complaint. Dkt. No. 53. I turn first to
the last motion filed, Brown's motion for leave to amend
his complaint a second time.

Brown seeks to file a second amended complaint
"setting forth in detail the personal involvement of each
defendant and how their acts of commission and omission
served to deprive plaintiff of Constitutionally secured
rights." Dkt. No. 53. The district court has discretion
whether to grant leave to amend. Ruffolo v. Oppenheimer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

& Co., 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss-the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

*2 Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to

allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a de novo determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for pro se pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. See Camardo v. General Motors Hourly-Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* *Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[FN1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

> FN1. I note, however, that the report-recommendation would survive even *de novo* review.

### CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

### ORDER and REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

### BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1-2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5-7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8-10.

In February, 1993, plaintiff was arrested on robbery

charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11-14; Exs. C-J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15-17; Exs. F-I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. See LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing Ortiz v. Cornette, 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart

and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

N.D.N.Y.,1997.

Brown v. Peters
Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURNCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURNCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants.** [1]

1  Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 7136*

**May 22, 1995, Decided**
**May 23, 1995, FILED**

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P.* *4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

### LexisNexis(R) Headnotes

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
*Governments > Federal Government > Employees & Officials*
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1).*

*Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations*
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1), 4(e)(1).*

*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308, 311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

*Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail*
*Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Parties > Interpleaders > General Overview*
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k).*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General*

*Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

*Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN8] See *28 U.S.C.S. § 1391(a)*.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview*
*Civil Procedure > Venue > Multiparty Litigation*
[HN9] See *28 U.S.C.S. § 1391(1)*.

*Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers*
*Civil Procedure > Venue > Individual Defendants*
*Civil Procedure > Venue > Multiparty Litigation*
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

*Civil Procedure > Venue > Motions to Transfer > General Overview*
*Civil Procedure > Judicial Officers > Judges > Discretion*
*Governments > Legislation > Statutes of Limitations > General Overview*
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*

*Civil Rights Law > General Overview*
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
*Civil Procedure > Parties > Self-Representation > Pleading Standards*
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

*Civil Procedure > Parties > Self-Representation > General Overview*
*Civil Procedure > Counsel > Appointments*
*Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals*
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1] HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P., Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three

amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*) [2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, [*6] it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

2   Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved

for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

3   Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8]   The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

> 4   The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.
>
> 5   The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against them. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

## ANALYSIS

### The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2).* Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P.*

*4(e)(1).* [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1) and 4(e)(1).* [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See N.Y. Civ. Prac. L. & R. §§ 308, 311* (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2).* Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

## II. The Jurisdictional Arguments

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

### A. Personal Jurisdiction

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k). See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

### B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The

state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983).* These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a). Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

> 6    We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

*1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332. Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989), cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

## C. Venue

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

[HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a). Section 1391(b)* provides that federal question actions, except as otherwise provided by law, may be brought only in

[HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).* [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

> 7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25]

of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).* [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363.*

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] *Civ. No. 94-C944 (D.D.C. 1994), Pourzandvakil v. Doty (E.D.N.Y. 1993), Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989)).* We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6).*

> 8    Former Supreme Court Justice Harry A. Blackmun.
> 9    We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989).* The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8.* The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993), aff'd 41 F.3d 1500 (2d Cir. 1994); cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540.*

### IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991).* Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695.*

### CONCLUSION

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875 (3d Cir.) cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))



**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. FN3 While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. FN4 At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report. [FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf. [FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999. [FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre, [FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

>FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

>FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

>FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia*, punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly, 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002),* is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at \*2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky*, 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry*, Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry*, the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> FN17. The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> FN18. There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See Flanagan,* 2002 WL 122921, at \*2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002) (noting that in the Second Circuit, confinement in a special

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

### b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.'" *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

### c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See* *Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see* *Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan, 152 F.3d 77, 80-81 (2d Cir.1998).* Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward, 458 F.Supp. 624, 627 (S.D.N.Y.1978).*

### d. Actions of the Hearing Officer

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

### e. Timeliness of the Hearing

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a).* In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord, 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000)* (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

### f. Notice

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997).* While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

### C. Retaliation

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

> FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7468636 (N.D.N.Y.)
**(Cite as: 2011 WL 7468636 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Derek WILLIAMS, Plaintiff,
v.
A. ROBERTS, Deputy Super. Adj., Washington
Correctional Facility; J. Johnson, Correctional Of-
ficer, Washington Correctional Facility; M.
YAHW,[FN1] Correctional Officer, Washington Cor-
rectional Facility; Lt. Edwards, Washington Correc-
tional Facility; and Yaki, Iman, Washington Cor-
rectional Facility, Defendants.

> FN1. According to papers submitted by the
> Defendants, the correct spelling of this
> party's name is "Yaw," thus the Court will
> refer to him by the correct spelling and the
> Clerk of the Court is directed to update the
> Docket Report to reflect this change. *See*
> Dkt. Nos. 8 & 11.

Civ. No. 9:11–CV–29 (GTS/RFT).
Dec. 15, 2011.

Derek Williams, Rochester, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of
the State of New York, Charles J. Quackenbush,
Esq., Assistant Attorney General, of Counsel, Al-
bany, NY, for Defendants.

***REPORT–RECOMMENDATION and ORDER***
RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Derek Williams brings this
civil rights action, pursuant to 42 U.S.C. § 1983, al-
leging that while he was incarcerated at Washing-
ton Correctional Facility, the Defendants violated
his constitutional rights protected under the First,
Eighth, Eleventh, and Fourteenth Amendments, as
well as his rights protected by the Religious Land
Use and Institutionalized Persons Act ("RLUIPA"),

42 U.S.C. § 2000cc, *et seq.* Dkt. No. 1, Compl.
Pending before this Court is Defendants' Motion to
Dismiss, filed pursuant to Federal Rule of Civil
Procedure 12(b)(6), Dkt. No. 11, which Plaintiff
opposes, Dkt. No. 17. For the reasons that follow, it
is hereby recommended that Defendants' Motion be
**granted** and this case be **dismissed.**

### I. ALLEGATIONS IN THE COMPLAINT

In accordance with the applicable standard of
review, the following facts derived from the Com-
plaint[FN2] are taken as true.

> FN2. Plaintiff's Complaint is comprised of
> the following: Complaint; Memorandum of
> Law; Affidavit in Support of Memorandum
> of Law; Exhibit One, Excerpted Copy of
> the Nation of Islam Prayer Book; Exhibit
> Two, Inmate Grievance Packet; and, Ex-
> hibit Three, Copy of Inmate Misbehavior
> Reports. Because all these purportedly sep-
> arate documents are enveloped into one
> continuous document, we consider them all
> to be a part of the Complaint and all cita-
> tion references thereto are to the page
> numbers automatically assigned by the
> Court's Case Management Electronic Case
> Files system.

In October and November 2007, Plaintiff was
in the custody of the New York State Department
of Corrections and Community Supervision
(DOCCS) and was housed in the Washington Cor-
rectional Facility.[FN3] During this time period,
Plaintiff received Misbehavior Reports on two sep-
arate occasions for, essentially, failing to comply
with count procedures and direct orders. Compl. at
p. 3. Plaintiff asserts that for both incidents, he was
engaging in cell prayer in accordance with his
membership in the Nation of Islam. *Id.* Because De-
fendants have moved for dismissal of the Com-
plaint attacking the timeliness of the action, we will
discuss the relevant time line associated with both
incidents.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7468636 (N.D.N.Y.)
**(Cite as: 2011 WL 7468636 (N.D.N.Y.))**

FN3. Upon information and belief, Plaintiff was released on parole on November 2, 2010. *See* Dkt. No. 1, Compl., at p. 9; *see also* DOCCS Inmate Information, *available at* http://nysdocslookup.docs.state.ny.us (last visited November 25, 2011, search for Department Identification Number ("DIN") 06–B–0593).

On October 23, 2007,[FN4] Plaintiff received a Misbehavior Report from Defendant C.O. Johnson for violating Prison Rules 106.10 (direct order), 112.21 (count procedures), and 104.13 (disturbance). Compl. at p. 19. Plaintiff asserts that at the time, he was engaged in Islamic prayer in his cell. *Id.* at p. 3. According to the Misbehavior Report accompanying the Complaint, Plaintiff disobeyed a direct order to sit on his bed and comply with count procedure, to which Plaintiff rebuffed, shouting that he was praying. *Id.* at p. 19. Plaintiff was immediately placed in confinement pending his hearing on the Misbehavior Report. *Id.* at p. 3. On October 25, 2007, Defendant Lieutenant Edwards conducted a Hearing on the Misbehavior Report, finding Plaintiff guilty of all three charges and sentencing him to keeplock for thirty days, with accompanying loss of privileges.[FN5] *Id.* at p. 20. Also on that date, Plaintiff appealed the Hearing disposition asserting that his faith requires prayer at fixed times, and that practice has never before interfered with count procedures. *Id.* at p. 25. On October 31, 2007, Defendant Roberts affirmed the Hearing disposition, noting that Plaintiff must comply with legitimate directives given by facility staff; Defendant Roberts also indicated that he conferred with Defendant Iman Yaki, who stated that he would counsel Plaintiff regarding prayer times. *Id.*

FN4. There appears to be a discrepancy regarding the date of this incident. In his Complaint, Plaintiff lists October 23, 2007, as the date this incident took place, however, the Misbehavior Report, which he attaches to his Complaint, lists October

22, 2007, as the date of the incident. While, in accordance with the applicable standard of review, we've taken the date recited in the Complaint as the true date, the discrepancy has no bearing on our overall analysis.

FN5. According to the Hearing Disposition, the keeplock penalty, which was supposed to start on October 25, 2007, was suspended for thirty days and deferred for ninety days. Without the benefit of a hearing transcript and full disciplinary report, it is not entirely clear whether Plaintiff served any portion of the keeplock sentence and there is no discussion of his sentence in the Complaint. The corresponding thirty-day loss of privileges was set to commence on November 6, 2007, and expire on December 6, 2007. Compl. at p. 20.

**\*2** On November 6, 2007,[FN6] Plaintiff received another Misbehavior Report for alleged non-compliance with count procedure. *Id.* at pp. 3 & 22. The Misbehavior Report, authored by Defendant Yaw, charged Plaintiff with violating Prison Rules 104.13 (disrupting order of facility), 106.10 (direct order), 112.20 (delaying count procedure), and 112.21 (facility count procedures). *Id.* at p. 22. Again, Plaintiff asserts that he was engaging in prayer at the time he was ordered to sit on his bunk in compliance with count procedures. *Id.* On November 14, 2007, Defendant Edwards initiated a Disciplinary Hearing and dismissed all charges as "untimely." *Id.* at pp. 23–24.

FN6. Once again, there is a discrepancy within the Complaint regarding the date of this incident. In his Complaint, Plaintiff states he was issued a second Misbehavior Report on November 6, 2007, while the Exhibit attached to the Complaint indicates that the date of the incident was November 5, 2007. Compl. at pp. 3 & 22. Again, we've taken the date recited in the Complaint as the true date and note that it has

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

no bearing on our overall analysis.

According to the Complaint and documents incorporated thereto, Plaintiff filed one Inmate Grievance, on October 22, 2007,[FN7] relative to the issue of prayer interruption. *Id.* at p. 15. By that Grievance, Plaintiff complained that on October 22nd, his early afternoon prayer, as mandated by his religion, was interrupted; he further complained about receiving a disciplinary infraction and for being placed on keeplock status. *Id.* It is not clear whether the Inmate Grievance Review Committee (IGRC) issued a decision on the Grievance, however, Plaintiff provides a decision, dated November 15, 2007, wherein the Superintendent denied Plaintiff's Grievance noting that during count procedures, inmates must be sitting on their beds without exception and that prayers within a prisoner's cube are allowed, but must not interfere with count procedures. *Id.* at p. 16. The decision also noted that Defendant Iman Yaki advised that there is no obligation to pray during count times and that Plaintiff must "make adjustments in order to be in compliance with facility procedures." *Id.* Plaintiff appealed that decision on November 28, 2007, asserting, based upon his understanding of the Holy Qur'an and past prayer participation, that Iman Yaki is incorrect.[FN8] *Id.* On January 9, 2008, the Central Office Review Committee (CORC) denied Plaintiff's appeal for the reasons stated by the Superintendent. *Id.* at p. 17.

> FN7. It is not clear when this Grievance was processed by the facility. The handwritten Grievance attached to the Complaint is dated October 22, 2007, and bears no facility stamp. Compl. at p. 15. The ensuing decisions on this Grievance each reflect a filing date of November 1, 2007. *Id.* at pp. 16 & 17. As with the other discrepancies, it has no bearing on our overall analysis.

> FN8. Attached to the Complaint is an excerpt from the Nation of Islams Prayer Book. Compl. at pp. 11–13. According to

such excerpt, there are five daily prayers for Muslims:

> 1. THE DAWN or EARLY MORNING prayer (known in Arabic as *Fajr* ), which is performed at daybreak and before sunrise.

> 2. THE EARLY AFTERNOON prayer (known in Arabic as *Zuhr* ), which is performed shortly *after* the noon hour.

> 3. THE LATE AFTERNOON prayer (known in Arabic as *Asr* ), which is performed around four o'clock in the afternoon, or close to two hours *before* sunset time.

> 4. THE SUNSET or EVENING prayer (known in Arabic as *Maghrib* ), which is performed just *after* the sunset.

> 5. THE LATE EVENING or NIGHTFALL prayer (known in Arabic as *Isha* ), which is performed nearly two hours *after* the sunset time or before retiring.

> It says in the Holy Qur'an Sharrieef (4:103), "Prayer indeed has been enjoined on the believers at fixed times." In other words, it is essential that each prayer be performed at the *appointed hour.*

> The exact time for each prayer will, of course, differ from coast to coast, especially when "Daylight Saving Time" is in force. To be sure of the precise hours, therefore, consult your Temple Minister.

> *Id.*

> Plaintiff never states which daily prayer was interrupted by Defendants Johnson and Yaw, thought both Misbehavior Reports reflect that the incidents occurred at approximately 3:00 p.m. *Id.* at pp. 19

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

& 22.

Plaintiff asserts that on or about April 24, 2008, he filed an Article 78 petition in New York State court challenging the Misbehavior Reports and complaining that he was punished for practicing his religion. *Id.* at p. 8. For various reasons, Plaintiff "allowed" his case to be dismissed, opting to pursue remedies in this Court. *Id.* at p. 4. He does not provide a date when that petition was dismissed. On or about November 2, 2010, Plaintiff was released on parole. Thereafter, on January 10, 2011, he filed the within civil rights Complaint pursuant to 42 U.S.C. § 1983.

## II. DISCUSSION
### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ( *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

**\*3** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus.*

*., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct, at 1960, 173 L.Ed.2d 868 (citing Twombly).[FN9] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

> FN9. By its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561–63 (2007) (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

## B. Plaintiff's Claims

**\*4** As noted above, Plaintiff asserts that his rights protected under the First, Eighth, Eleventh, and Fourteenth Amendments were violated when the Defendants penalized him for engaging in prayer in his cell at times that he believes have been designated by his religion. He further asserts that the Defendants violated his rights protected by RLUIPA. Defendants assert that Plaintiff's Fourteenth Amendment Due Process claims are time barred, his RLUIPA claims are barred by the Eleventh Amendment, and, with regard to the First Amendment and RLUIPA claims, Defendants are entitled to qualified immunity. [FN10]

> FN10. Defendants do not put forth any argument regarding the purported Eighth or Eleventh Amendment claims. Nevertheless, as noted herein, Plaintiff fails to adequately state a cause of action pursuant to these two Amendments. *See infra* Part II.B.4.

### 1. Due Process Claim

In his Complaint, Plaintiff does not enunciate the alleged due process infirmities that he believes plagued his two Disciplinary Hearings. Thus, it is not clear to this Court how Plaintiff's Due Process rights were violated during his October 25th and November 14th Disciplinary Hearings. Nor, for that matter, has Plaintiff described what liberty interests he was deprived of as a result of the two Hearings. *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner wishing to pursue a due process claim must show that as a result of insufficient process, he was deprived of some liberty interest). Stated another way, Plaintiff has not shown that either Disciplinary Hearing resulted in a sanction that was atypical and significant in comparison to the ordinary incidents of prison life thereby triggering Due Process protections. *Id.* (stating that an inmate has no constitutional right to any procedural safeguards unless the deprivation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"). Indeed, Plaintiff would be hard-pressed to identify any procedural violation occurring during the November 14th Hearing, wherein the charges were dismissed and no punishment ensued.

Instead, it appears that the entirety of Plaintiff's Due Process claims rest upon the notion that his religious prayers were inappropriately interrupted on two occasions and he was thereafter unduly punished for engaging in such prayer and, by extension, for practicing his religion. While these allegations may suffice at this juncture to support a claim that his First Amendment rights were denied, it does not support a claim for the denial of procedur-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7468636 (N.D.N.Y.)
**(Cite as: 2011 WL 7468636 (N.D.N.Y.))**

al Due Process under the Fourteenth Amendment. On this basis alone, we could easily recommend dismissal of the Due Process claims for failure to state a claim. However, were this to be our recommendation, we would feel compelled to allow Plaintiff to amend his Complaint in order to expand upon the Due Process violations that occurred and the particular liberty interests at stake. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting several cases for the proposition that a court should not dismiss a *pro se* complaint without first granting leave to amend if there is any indication that a valid claim could be stated). Such amendment, however, would be futile because, as Defendants suggest, the statute of limitations has run on this claim, and no amendment of the Complaint could cure this defect. *See Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000) (noting that while leave to amend should ordinarily be freely granted, the court has discretion to deny such amendment as futile if the claim would be barred by the applicable statute of limitations).

**\*5** In § 1983 actions, the applicable statute of limitations is the State's "general or residual statute for personal injury actions." *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)) (alterations omitted). In New York, a three-year statute of limitations applies for personal injury actions and thus to § 1983 actions. *Id.; see also* N.Y.C.P.L.R. § 214(5). Although State law provides the relevant limitations period, federal law determines when a § 1983 action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) (citation omitted). Thus, in determining when a particular claim accrues, courts must focus on when a "plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980).

In this case, Plaintiff filed his Complaint on

January 10, 2011; for any § 1983 claim to be considered timely filed, it must have accrued no earlier than January 10, 2008.

Courts in this District have generally set the accrual date for procedural Due Process claims related to disciplinary hearings either at the date of the disciplinary hearing or at the date the prisoner's final administrative appeal is decided. *Odom v. Calero,* 2008 WL 449677, at \*6–7 (S.D.N.Y. Feb.19, 2008); *Abbas v. Dixon,* 2004 WL 2202640, at \*2 (W.D.N.Y. Sept.30, 2004).[FN11] In this case, Plaintiff's Hearings were held on October 25 and November 14, 2007, and those are the relevant dates when Plaintiff was, or should have been, aware of any Due Process violations that ensued. Therefore, for the Due Process claims asserted against Defendant Edwards, who presided over both Disciplinary Hearings, the limitations period expired on October 25 and November 14, 2010, respectively. To the extent Plaintiff asserts a Due Process claim against Defendant Roberts for affirming the October 25th conviction/sentence, such claim accrued on October 31, 2007, the date when the Superintendent confirmed the October 25th conviction/sentence, and thus expired on October 31, 2010.[FN12]

> FN11. Citing the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 490, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Defendants suggest that the Due Process claim accrues on the date the conviction/sentence has been invalidated and state that Plaintiff was " 'aggrieved' for time bar analysis purposes as of October 31, 2007 when the Superintendent affirmed the convictions/sentence." Dkt. No. 11–1 at p. 5. In *Heck* the Supreme Court held that if a decision in the plaintiff's favor would invalidate the underlying conviction in some manner, the § 1983 claim is not cognizable until the prisoner can show that such conviction has been invalidated through appeal or some other mechanism. There is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7468636 (N.D.N.Y.)
**(Cite as: 2011 WL 7468636 (N.D.N.Y.))**

nothing in the current Complaint that would suggest that the sentence meted out on October 25th affected the overall length or duration of Plaintiff's sentence in any manner. Thus, the accrual rule set forth in *Heck* does not apply.

FN12. The precise accrual date for the due process claims may also be affected by a recent Second Circuit decision which held that the time during which a prisoner exhausts his administrative remedies, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a), is omitted from the limitations period; in other words, the statute of limitations is equitably tolled during the Plaintiff's pursuit of complete exhaustion. *See Gonzalez v. Hasty,* 651 F.3d 318, 323–24 (2d Cir.2011). It is not clear whether the Second Circuit intended to extend the *Gonzalez* holding to a Due Process claim, wherein the exhaustion requirement is satisfied not through the prisoner grievance program but through administrative appeal. Nor is it clear whether the PLRA applies to Plaintiff Williams who filed this action when he was no longer in jail. We need not speculate on either front since even utilizing the latter date of October 31, 2007, and omitting the six days between the disciplinary Hearing and the appeal determination, Plaintiff's Due Process claims are time-barred.

We also note that Plaintiff's filing of an Article 78 proceeding in New York State court on April 24, 2008, which was thereafter dismissed on some unspecified date, has no effect on the statute of limitations calculation. Although federal law determines when the claim accrues, state tolling rules determine whether the limitations period has been tolled. *Bd. of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980).

The Second Circuit has held that, in accordance with New York law, the filing of an Article 78 petition does not toll the limitations period. *See Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) (cited in *LeBron v. Swaitek,* 2007 WL 3254373, at *2 (N.D.N.Y. Nov.2, 2007) ).

Because the statute of limitations expired prior to Plaintiff bringing the within action, we recommend that Defendants' Motion to Dismiss be **granted** as to the Due Process claims asserted against Defendants Edwards and Roberts. FN13

FN13. Defendants have not moved for dismissal of any other claim under the theory that the statute of limitations has expired. We note that RLUIPA has a statute of limitations of four years, and thus appears to be timely filed. *See* 28 U.S.C. § 1658(a). It is debatable whether the First Amendment claims have expired prior to the filing of the Complaint. Again, because Defendants have not moved on this basis, we do not consider this issue, but we note that the recent holding in *Gonzalez v. Hasty,* 651 F.3d 318 (2d Cir.2011), could affect the limitations period, and by our calculation, it appears that Plaintiff may have filed this action on the last date of such period.

**2. RLUIPA**

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the burden on that person—

**\*6** (1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Recently, the Supreme Court declared that monetary damages are unavailable to litigants pursuing claims under RLUIPA. *Sossamon v. Texas,* —— U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). The Court held that the acceptance of federal funds did not mean that the States consented to waiving their sovereign immunity to suits for money damages. *Id.* at 1655 & 1658–59 (noting that the waiver of sovereign immunity for monetary relief must be unambiguously stated, and RLUIPA's authorization of "appropriate relief against a government" does not meet this test). Thus, any request for monetary damages under RLUIPA should be **dismissed.**

What's left then of Plaintiff's RLUIPA claim is the request for injunctive relief, which includes 1) expungement of his institutional record with regard to these incidents; and 2) internal investigation by DOCCS to determine whether Defendants should keep their jobs, if they haven't already retired. Compl. at p. 6. Defendants argue that because Plaintiff is no longer in DOCCS's custody, this claim is moot. Dkt. No. 11–1 at pp. 5–6. We agree.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies.... This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (internal quotation marks and citations omitted); *see also North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). A federal court has no authority to decide an issue when the relief sought can no

longer be given, or is no longer needed. *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Generally only where the plaintiff "can make a reasonable showing that he will again be subjected to the alleged illegality" would such exception apply. *Id.; see also Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (citing *Lyons* for the proposition that the capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur).

Where, as here, a prisoner has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot. *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000). And, the limited exception for repetitive conduct does not appear to be applicable in this instance. Thus, before even getting to the merits of Plaintiff's RLUIPA claim, we recommend that Defendants' Motion to Dismiss be **granted** as the Court lacks jurisdiction over a moot claim.[FN14]

> FN14. As an aside, were we to get to the merits of Plaintiff's RLUIPA claim, the Supreme Court's pronouncement that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" would certainly weigh heavily against Plaintiff. *Cutter v. Wilkinson,* 544 U.S. 709, 722, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

### 3. Qualified Immunity

**\*7** The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

The only pleading filed in the present case thus far is the Complaint. Defendants have not raised this affirmative defense in a responsive pleading as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of their Motion to Dismiss. Generally, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). However, an exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; on such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

We readily acknowledge, and Plaintiff does not contest, that the Complaint, on its face, sets up the qualified immunity defense. Until recently, courts faced with the qualified immunity defense applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), whereby a court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right, and if so, whether the right at issue was "clearly established" at the time of the alleged misconduct. 533 U.S. at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs

may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

In light of *Pearson,* we need not decide in the first instance whether Defendants violated Plaintiff's First Amendment rights. Rather, we may get to the heart of the matter and address whether Plaintiff had a clearly established right to pray in his cell at any time he wishes without interruption.

"A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Jackler v. Byrne,* 658 F.3d 225, 242–43 (2d Cir.2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "In determining if a right is clearly established, [courts] look to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011) (citation omitted). A qualified immunity analysis must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Saucier v. Katz,* 533 U.S. at 201).

**\*8** The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. These provisions are applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (cited in *Wares v. Vanbebber,* 319 F.Supp.2d 1237, 1243 (D.Kan.2004)). Prisoners retain their right to religious freedom even when incarcerated. *Pell v. Procunier,* 417 U.S. 817, 822 (1974); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). Such rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). Free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)); *see also Ford v. Mc-Ginnis,* 352 F.3d 582, 588 (2d Cir.2003).

Pursuant to this reasonableness test, a prison regulation that impinges upon an inmate's constitutional rights may be valid, despite such encroachment, if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Farid v. Smith,* 850 F.2d at 925. In this case, it is not entirely clear whether Plaintiff feels that the count procedure itself encroached upon his religious freedom, or if it was simply the individualized acts of Defendants Johnson and Yaw. Nevertheless, an individualized decision to "deny a prisoner the ability to engage in some requested religious practice" is analyzed in the same manner as a prison regulation denying such exercise. *Ford v. McGinnis,* 352 F.3d at 595 n. 15 (citing *Young v. Coughlin,* 866 F.2d 567 (2d Cir.1989)).

Pointedly, neither the Supreme Court nor the Second Circuit has held that brief interruption to prayers performed inside a jail cell for the purpose of conducting security inmate counts is violative of the First Amendment. In fact, all jurisprudence states otherwise, to wit, as noted above, a prisoner's First Amendment right to free exercise may be limited, as long as such limitations are reasonably related to legitimate penological interests. The security interests in conducting an inmate count at set times during the day cannot be understated. And, in such instances, the courts typically defer such security decisions to those in the corrections arena. *Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Ochoa v. Connell,* 2007 WL 3049889, at *7 (N.D.N.Y. Oct.18, 2007) (noting that "while some accommod-

ations are to be made for a prisoner's sincerely held religious beliefs, we questions whether such accommodations reasonably include converting a cell into a sacrosanct venue so that no visitor could ever trespass over the threshold of the cell doors whenever the occupant deemed it appropriate to engage in prayer"). Therefore, without a clearly established right to engage in uninterrupted prayer in one's cell in the face of a legitimate penological interest, and because Defendants Johnson and Yaw acted reasonably, they are entitled to the qualified immunity defense and their Motion should be **granted** on this basis.

*4. Remaining Claims*

**\*9** Plaintiff notes in his Complaint that Defendants violated his Eighth and Eleventh Amendment rights. It is not clear in what way Defendants trampled upon such rights, nor can this Court reasonably discern such a claim from the facts alleged in the Complaint. Thus, we recommend, pursuant to 28 U.S.C. § 1915(e), that such claims be dismissed for failure to state a claim upon which relief could be granted.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 11) be **granted** and this case be dismissed; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 7468636 (N.D.N.Y.)
**(Cite as: 2011 WL 7468636 (N.D.N.Y.))**

& 6(a).

N.D.N.Y.,2011.
Williams v. Roberts
Not Reported in F.Supp.2d, 2011 WL 7468636
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.